Ken SWANSON, Jeanne Swanson, and Arthur Kellogg, Plaintiffs,

v.

Mike VAN OTTERLOO, Individually and as Sheriff of Plymouth County, Plymouth County, a governmental entity, Tom Bice, Dick Moritz and Craig Bartolozzi, Defendants.

No. C96–4053–MWB.

United States District Court,
N.D. Iowa,
Western Division.

Jan. 31, 1998.

J. Russell Hixson, Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, IA, for Plaintiffs.

G. Daniel Gildemeister, Michelle R. Sherman, Steven J. Andreasen, Gildemeister, Willia & Keanne, L.L.P., Sioux City, IA, for Defendants.

**MEMORANDUM OPINION AND ORDER REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT**

BENNETT, District Judge.

**TABLE OF CONTENTS**

I. *INTRODUCTION AND PROCEDURAL BACKGROUND* ....................1227

II. *STANDARDS FOR SUMMARY JUDGMENT* .............................. 1230

III. *FACTUAL FINDINGS* ............................................. 1232
 A. *Undisputed Facts* ......................................... 1232
 B. *Disputed Facts* .......................................... 1232

IV. *LEGAL ANALYSIS* .............................................. 1233
 A. *Capacity of Defendants* ................................... 1233
 B. *Swanson's First Amendment Claim* .......................... 1233
 1. *Patronage dismissals:. The Elrod–Branti rule* ......... 1234
 2. *Application of the Elrod–Branti rule* ................. 1235
 3. *Qualified immunity* ................................... 1236
 a. *Procedural bar* .................................. 1236
 b. *The merits* ...................................... 1236
 4. *Free speech: The Pickering test* ..................... 1239
 a. *Application of the Pickering test* ............... 1239
 b. *Qualified immunity* ............................. 1240
 C. *Municipality Liability* ................................... 1240
 1. *Requisites for imposing municipal liability* .......... 1240
 2. *Adequacy of the pleadings* ............................ 1241
 3. *Was Van Otterloo a final "policymaker?"* .............. 1241
 D. *Jeanne's Remaining § 1983 Claim* .......................... 1242

V. *CONCLUSION* ................................................. 1242

Clashing political aspirations led to a showdown at the Plymouth County Sheriff's Office. In this lawsuit brought pursuant to 42 U.S.C. § 1983, the plaintiffs, all former employees of the sheriff's office, contend that when one of them made it known that he intended to challenge the incumbent sheriff in the upcoming election, the defendant sheriff and his deputies responded by committing infringements of the plaintiffs' constitutionally-protected rights to political affiliation, free speech, equal protection, and due process. Before the court are the parties' cross-motions for summary judgment.

# I. INTRODUCTION AND PROCEDURAL BACKGROUND

On June 4, 1996, plaintiffs Ken Swanson, Jeanne Swanson, and Arthur Kellogg, all former employees of the Plymouth County Sheriff's Office, filed a complaint pursuant to 42 U.S.C. § 1983 against defendants Plymouth County and Mike Van Otterloo, individually and in his official capacity as Plymouth County Sheriff. The original complaint alleged violations of the First Amendment to the United States Constitution and pendant state-law claims for intentional infliction of emotional distress.

On March 31, 1997, the plaintiffs amended their complaint adding as defendants Plymouth County deputy sheriffs Tom Bice, Dick Moritz, and Craig Bartolozzi,[1] and expanding the federal and state law claims lodged in their original complaint. In Count I, the plaintiffs allege claims pursuant to 42 U.S.C. § 1983 for violations of their rights under the First Amendment of the United States Constitution.[2] Specifically, Ken Swanson

---

1. Unlike Van Otterloo, the deputy sheriff defendants were not named in their official capacities in the caption of the complaint. The significance of this difference will be addressed later in this opinion.

2. The court has described Counts I–III as brought "pursuant to" 42 U.S.C. § 1983. The plaintiffs actually captioned these claims as "violations of" § 1983 *and* various constitutional amendments. As this court has noted, one does not "violate" § 1983. *See Rural Water Sys. # 1 v. Sioux Center*, 967 F.Supp. 1483, 1503 (N.D.Iowa

1997); *Laird v. Ramirez*, 884 F.Supp. 1265, 1282 n. 11 (N.D.Iowa 1995).

 Title 42 U.S.C. § 1983 provides that
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in

("Swanson") complains that his termination from the Plymouth County Sheriff's Office violated his right to affiliate with a political party and to run for public office, as well as his right to free speech. Jeanne Swanson and Arthur Kellogg also contend that their First Amendment rights to political affiliation and freedom of association were violated and as a result, they were constructively discharged. In Counts II and III, the plaintiffs assert additional claims pursuant to § 1983 for deprivations of equal protection and due process all in violation of the Fifth

and Fourteenth Amendments of the United States Constitution. In Count IV, Swanson complains that the defendants committed civil theft in violation of Iowa Code Chapter 714 by improperly confiscating his campaign signs.[3] Finally, Count V alleges a claim by Jeanne Swanson and Arthur Kellogg for intentional infliction of emotional distress. On January 20, 1998, the plaintiffs filed a motion to voluntarily dismiss Count V. The court granted this motion on January 30, 1998. The claims relevant to the pending cross-motions for summary judgment are summarized in the following chart:

| Claims | | Plaintiffs | Defendants |
| --- | --- | --- | --- |
| Count I: | 1st Amendment | Swanson, Jeanne, Kellogg | Van Otterloo and Plymouth County |
| Count II: | Equal Protection | Swanson | all defendants |
| Count III: | Due Process | Swanson, Jeanne, Kellogg | all defendants |

The defendants submitted timely answers to both the original and the amended complaints. On October 15, 1997, the defendants filed a motion for leave to amend their answer to the amended complaint for the purpose of asserting additional affirmative defenses.[4] United States Magistrate Judge Paul A. Zoss granted this motion, and the amended answer was filed on November 20, 1997.

Prior to Judge Zoss' grant of their motion for leave to amend answer, the defendants filed a motion for summary judgment on Counts I through III and Count V of the amended complaint. Because the court has granted the plaintiffs' motion to voluntarily dismiss Count V of the complaint, the court

need not further address the defendants' motion for summary judgment as to this claim. As to the remaining claims, the defendants' have asserted the following arguments in support of their motion for summary judgment.

Defendant Van Otterloo contends that he is entitled to summary judgment on Ken Swanson's First Amendment claim (Count I) because his placement of Swanson on "inactive status" was a constitutionally permissible patronage dismissal. Alternatively, Van Otterloo asserts that even if Swanson's termination was not a patronage dismissal, Van Otterloo is shielded from liability in his individual capacity by virtue of the defense of qualified immunity.[5]

an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983. Section 1983 was designed to provide a "broad remedy for violations of federally protected civil rights." *Monell v. Dept. of Soc. Serv. of City of New York*, 436 U.S. 658, 685, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *However, § 1983 provides no substantive rights. Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979) (emphasis added). *"[O]ne cannot go into court and claim a 'violation of section 1983—for section 1983 by itself does not protect anyone against anything.' Id. Rather, section 1983 provides a remedy for violations of all 'rights, privileges, or immunities' secured by the Constitution and laws [of the United States]."* 42 U.S.C. § 1983; *Maine v. Thiboutot*, 448 U.S. 1, 3, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) (emphasis added). Although the plaintiffs are incorrect to assert "violations" of § 1983, § 1983 may provide a vehicle whereby the plaintiffs may bring

before this court their claims of constitutional deprivations.

3. Swanson's civil theft claim is not at issue in the present cross-motions for summary judgment.

4. Specifically, the defendants sought to add four additional defenses: lack of subject matter jurisdiction pursuant to the exclusivity provisions of the Iowa Workers Compensation Act; release and settlement; bar by election to proceed with a worker's compensation claim; and failure to state a claim for which relief can be sought under 42 U.S.C. § 1983 (by defendant Plymouth County only).

5. Van Otterloo raised the affirmative defense of qualified immunity for the first time in the defendants' motion for summary judgment. In their resistance, the plaintiffs submit that Van Otterloo has waived this defense by virtue of his failure to plead it in any of the three answers filed as of November 20, 1997. On January 7, 1998, the defendants moved for leave to amend their an-

Defendant Plymouth County moves for summary judgment on Counts I, II and III on the ground that the plaintiffs have failed to state a cause of action against it on these claims because there is no respondeat superior liability under 42 U.S.C. § 1981. Alternatively, as to the all claims asserted by Jeanne Swanson and Arthur Kellogg (contained in Counts I and III), Plymouth County contends that it is entitled to summary judgment based on the exclusivity provisions of the Iowa Workers' Compensation Act ("IWCA"). Plymouth County also argues that any claims brought against it by Jeanne and Kellogg are barred by the "settlements and releases in their worker's [sic] compensation claims against Plymouth County." Defendants' Motion for Summary Judgment at ¶ 4(b).

All defendants assert that they are entitled to summary judgment on the plaintiffs' due process claims (Count III). The gravamen of this argument is that all of the plaintiffs have failed to identify the requisite "property" or "liberty" interest necessary to assert a due process claim.

The plaintiffs have resisted the motion for summary judgment in its entirety. Additionally, plaintiff Van Otterloo has filed a cross-motion for summary judgment on his First Amendment claim against defendants Van Otterloo and Plymouth County. Plaintiffs Jeanne Swanson and Kellogg have also moved for partial summary judgment against all defendants on the issues of exclusivity of the IWCA and the effect of the releases that these two plaintiffs entered into in settling their workers' compensation claims.[6]

The court heard oral arguments on the parties' cross-motions for summary judgment on January 21, 1998. The plaintiffs were represented by counsel J. Russell Hixson of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, Iowa. The defendants were represented by counsel G. Daniel Gildemeister, Michelle R. Sherman, and Steven J. Andreasen of Gildemeister, Willia & Keane, L.L.P., Sioux City, Iowa.

Oral arguments not only assisted the court in its consideration of the issues raised by the parties, but also narrowed the grounds upon which summary judgment is sought. Specifically, counsel for the defendants conceded that the IWCA does not preempt claims for violations of federal rights. The defendants also acknowledged that the release contained in Kellogg's worker's compensation settlement agreement did not serve as a bar to claims for constitutional violations brought pursuant to § 1983. Additionally, the defendants withdrew from their original position that plaintiffs Swanson and Kellogg failed to identify a cognizable property interest sufficient to warrant their claims for due process violations.

For their part, the plaintiffs acknowledged that they have failed to identify any colorable liberty interest in their due process claims. As a practical matter, this acknowledgment extinguished Jeanne Swanson's claim for deprivations of due process because unlike Swanson and Kellogg, Jeanne did not identify a separate property interest allegedly infringed by the defendants.[7] The court commends counsel for both parties for their candor and professionalism in making these concessions.

The following claims and corresponding motions, summarized in the chart below, remain before the court for its consideration: the cross-motions for summary judgment on Ken Swanson's First Amendment claim; defendant Plymouth County's motion for summary judgment on Counts I, II and III on the ground that it cannot be held liable under a theory of respondeat superior; Plymouth County's alternative motion for summary judgment as to Jeanne's First Amendment claim on the theory that her worker's com-

swer to include qualified immunity as an additional affirmative defense. After hearing oral argument, Judge Zoss denied the defendants' motion for leave to amend.

**6.** Prior to filing their resistance to the defendants' summary judgment motion, plaintiffs filed a Motion To Strike Affirmative Defenses. In their motion, plaintiffs urged the court to strike any affirmative defense premised on the exclusivity of the IWCA. Because the defendants had already filed their motion for summary judg-

ment, Judge Zoss declined to rule on the motion to strike. This court will therefore consider the arguments raised in plaintiffs' motion to strike in resolving the pending summary judgment motions.

**7.** Both Ken Swanson and Kellogg identified property interests. Swanson claimed a property interest in his campaign signs, and Kellogg claimed a property interest in his employment as a public employee covered by statutory civil service protections.

pensation settlement and release bars her from bringing any and all claims against Plymouth County; and Jeanne's cross-motion that her settlement and release is not a bar to her First Amendment claim against Plymouth County.

| Claims | Plaintiffs | Defendants | Motion for S.J.? | Cross-mtn. for S.J.? |
|---|---|---|---|---|
| Count I: 1st Amendment | Swanson, Jeanne, Kellogg | Van Otterloo and Plymouth County | Van Otterloo and Plymouth County | Swanson (total s.j.); Jeanne (partial s.j.) |
| Count II: Equal Protection | Swanson | all defendants | Plymouth County | none |
| Count III: Due Process | Swanson, Kellogg | all defendants | Plymouth County | none |

Having reviewed the complex and somewhat tortured procedural history of this matter, the court will turn first to the standards applicable to cross-motions for summary judgment. Next, the court will set forth a recitation of the undisputed and disputed facts as established by the summary judgment record. Finally, the court will turn to its legal analysis and resolution of the parties' motions.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions,* 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly sixty years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini,* 900 F.2d at 1238 (quoting *Celotex,* 477 U.S. at 327); *Hartnagel v. Norman,* 953 F.2d 394, 396 (8th Cir.1992).

The standard for granting summary judgment is well established. Rule 56 of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

For Claimant. A party seeking to recover upon a claim, counterclaim, or crossclaim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits; for a summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED.R.CIV.P. 56(a)–(c) (emphasis added); *see also Celotex,* 477 U.S. at 322–23; *Reliance Ins. Co. v. Shenandoah S., Inc.,* 81 F.3d 789, 791 (8th Cir.1996); *Beyerbach v. Sears,* 49 F.3d 1324, 1325 (8th Cir.1995); *Munz v. Michael,* 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.,* 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone,* 993 F.2d 1328, 1331 (8th Cir.1993); *Woodsmith Publishing Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini,* 900 F.2d at 1238 (citing FED.R.CIV.P. 56(c).[8] A

---

**8.** An issue of material fact is genuine if it has a real basis in the record. *Hartnagel,* 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co. v. Zenith*

court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, and give the non-moving party the benefit of all reasonable inferences that can be drawn from the facts. *Matshusita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962))); *Quick v. Donaldson Co.,* 90 F.3d 1372, 1377 (8th Cir.1996); *Rifkin v. McDonnell Douglas Corp.,* 78 F.3d 1277, 1280 (8th Cir.1996); *Marts v. Xerox, Inc.,* 77 F.3d 1109, 1112 (8th Cir.1996); *Munz,* 28 F.3d at 796; *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.,* 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene,* 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield,* 939 F.2d 666, 667 (8th Cir.1991), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323); *see also Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). The moving party is not required by Rule 56 to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

"When a moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. The nonmoving party is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e); *Celotex,* 477 U.S. at 324; *Rabushka, ex rel. U.S. v. Crane Co.,* 122 F.3d 559, 562 (8th Cir.1997); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325. Although "direct proof is not

required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.' " *Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Prods., Inc. v. Herrick,* 715 F.2d 1267, 1272 (8th Cir.1983), cert. denied, 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Allison,* 28 F.3d at 66.

In *Anderson,* 477 U.S. at 249, *Celotex,* 477 U.S. at 323–24, and *Matsushita,* 475 U.S. at 586–87, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Quick,* 90 F.3d at 1376–77; *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nomnovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel,* 953 F.2d at 396 (citing *Celotex,* 477 U.S. at 322). If the nonmoving party fails to make such a sufficient showing of an essential element of a claim with respect to which it has the burden of proof, then the moving party is "entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 323; In re *Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997); *Woodsmith,* 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then

*Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

summary judgment should not be granted. *Anderson,* 477 U.S. at 248; *Burk,* 948 F.2d at 492; *Woodsmith,* 904 F.2d at 1247. With these standards in mind, the court turns to consideration of the parties' cross-motions for summary judgment.

### III. FACTUAL FINDINGS

#### A. Undisputed Facts

The record and submissions of the parties demonstrate that the following facts are undisputed. Swanson has served as Chief of Police for the city of Kingsley, Iowa since 1988.[9] In July 1992, Swanson was hired by Van Otterloo as a "Special Deputy" for the Plymouth County Sheriff's Office.[10] As a special deputy, Swanson served as a part-time law enforcement officer who worked on an "as needed" basis to cover shifts that could not be covered by regular deputies. During the time he was employed as a special deputy, Swanson continued to perform his duties as police chief.

Swanson's spouse, Jeanne, and Arthur Kellogg were also employed by the Plymouth County Sheriff's Office. Jeanne worked as a dispatcher for the sheriff's office from approximately March 1993 through November 1994. Kellogg served as a regular Plymouth County Deputy Sheriff for nearly nine years. Kellogg left his employment at the sheriff's office in November 1994.

Sometime during June or July of 1993, Swanson began to make it known to various persons, including Kellogg, that he intended to run against Van Otterloo for the position of Plymouth County Sheriff in the 1996 election. Swanson performed his special deputy hours without incident until October 8, 1993. After that time, Swanson did not receive any more special deputy shifts, although he did have occasion in his capacity as Kingsley's Police Chief to conduct business at the Plymouth County Sheriffs Office.

On May 10, 1994, Van Otterloo telephoned Swanson to request that Swanson return his badge and radio to the sheriff's office. According to Van Otterloo's notes of this conversation, Van Otterloo advised Swanson that he had "no intentions of allowing [Swanson]

to work any hours, so there was no sense in him having any badges." Van Otterloo's notes also reflect that he made the following statement to Swanson regarding the election: "I also explained that he wanted my job and I wanted to keep it, therefore I was not about to have him running around the county in a deputy's uniform."

Jeanne and Kellogg continued to work at the Plymouth County Sheriff's Office until November 1994. Both Jeanne and Kellogg contend that they were subjected to a relentless pattern of harassment and retaliation by the defendants because of their social and political affiliations with Swanson. Jeanne and Kellogg each filed worker's compensation claims against Plymouth County for injuries they suffered as a result of the harassment and attendant stress they experienced. On April 26, 1996, Jeanne signed a Special Case Settlement releasing her worker's compensation claims against Plymouth County. On January 3, 1997, Kellogg also signed a Contested Case Settlement releasing his worker's compensation claims. Both settlements were approved by the Iowa Industrial Commissioner.

#### B. Disputed Facts

The disputed facts in this case are few. The question to be addressed below, in the court's legal analysis, is whether these disputes are material under the governing law, such that they preclude summary judgment on any of the plaintiffs' claims. *See, e.g.,* FED.R.CIV.P. 56(c); *Celotex Corp.,* 477 U.S. at 322–23; *Anderson,* 477 U.S. at 248; *Beyerbach,* 49 F.3d at 1326.

Originally, the parties disputed whether Van Otterloo's placement of Swanson on "inactive status" constituted a termination. Swanson maintained that he was terminated after Van Otterloo became privy to his plan to challenge Van Otterloo in the election. Van Otterloo countered with the argument that Swanson was only banished to "inactive status" temporarily—that is until after the election. At oral argument, Van Otterloo's counsel conceded that, at least for the pur-

---

9. Kinglsey is located in Plymouth County.

10. At oral argument, the parties informed the court that the post of special deputy is not considered a civil service position under Iowa law.

poses of summary judgment, Swanson was terminated from his employment as a special deputy with the Plymouth County Sheriff's Office.

The only remaining factual disputes center around the atmosphere of the sheriff's office during the latter months of 1993 and the early months of 1994. Swanson asserts that his statements and actions concerning the election occurred on "his own time" and had no bearing upon his performance as a special deputy or upon the morale and performance of the deputies and other employees of the sheriff's department. The defendants have submitted affidavits and deposition excerpts to the contrary. These submissions reflect that Swanson's announcement and subsequent statements regarding the election and Van Otterloo caused dissension, morale problems, and "lack of trust" among the deputies. The defendants further assert that Swanson made derogatory remarks about Van Otterloo, contributing to the disruption in the sheriffs department.

## IV. LEGAL ANALYSIS

### (including some further findings of fact)

#### A. Capacity of Defendants

Before considering the parties' motions and supporting contentions, the court must answer the following question—in what capacity have the defendants been sued? Because resolution of this question will affect any remedies and relief ultimately available to the plaintiffs, the court will address it first before turning to the substance of the parties' cross-motions for summary judgment.

Although the caption of the plaintiffs' amended complaint names Van Otterloo "individually" and in "his capacity as Sheriff of Plymouth County," no such specification exists with regard to defendants Bice, Bartolozzi, and Moritz. The Eighth Circuit Court of Appeals has observed that plaintiffs seeking to sue public officials in their individual capacities or in both their official and individual capacities should clearly specify as much in their complaint. See, e.g., Murphy v. Arkansas, 127 F.3d 750, 754–55 (8th Cir.1997) (noting that personal capacity claims must be "clearly-pleaded not only to insure adequate notice to defendants, but also because of the jurisdictional limitations implicated by the Eleventh Amendment in § 1983 cases"); Egerdahl v. Hibbing Community College, 72 F.3d 615, 620 (8th Cir.1995) (observing that "[n]either a cryptic hint in a plaintiff's complaint nor a statement made in response to a motion to dismiss is sufficient" to establish a personal capacity suit); Nix v. Norman, 879 F.2d 429, 431 (8th Cir.1989); see also Lyon v. Grossheim, 803 F.Supp. 1538, 1556 (S.D.Iowa 1992).

Here, the pleadings refer to Bice, Bartolozzi, and Moritz in their capacities as deputy sheriffs, employed by Plymouth County. A presumption is therefore created that these defendants are being sued in their official capacities only. See Kolar v. County of Sangamon, 756 F.2d 564, 568 (7th Cir.1985). The plaintiffs urge the court to disregard this presumption on the ground that the driving force behind the presumption is the Eleventh Amendment's jurisdictional limitation of monetary damages against the State. The plaintiffs maintain that because the Eleventh Amendment is not implicated in this case, there is no need to apply the presumption.

The court finds this argument to be more creative than persuasive. While it is true that the Eighth Circuit Court of Appeals has discussed Eleventh Amendment jurisdictional restraints when enforcing the rule that personal capacity claims be clearly pleaded, see e.g., Murphy, 127 F.3d at 755, the court has also observed that the rule ensures adequate notice to defendants that they may be personally liable for the claims asserted against them. See id. In this case, there is no indication from the pleadings that the plaintiffs have brought suit against Bice, Bartolozzi, and Moritz in their individual capacities. Moreover, these defendants had no reason to suspect they were being sued in their individual capacities because unlike Van Otterloo, they were not so named. Given these circumstances, the court concludes that the presumption of official capacity applies. Accordingly, under the presumption, the plaintiffs are deemed to have brought suit against Bice, Bartolozzi, and Moritz in their official capacities only.

#### B. Swanson's First Amendment Claim

Swanson's First Amendment claim centers around his contention that he was "summari-

ly terminated" when Van Otterloo learned that Swanson intended to challenge him in the 1996 Sheriff election. Swanson asserts that this termination constitutes a violation of his First Amendment right to run for political office and to speak about matters of public concern.

Defendant Van Otterloo has asserted three alternative grounds in support of his motion for summary judgment on this claim. First, Van Otterloo argues that his placement of Swanson on "inactive status" amounted to a constitutionally permissible patronage dismissal. Second, Van Otterloo contends that Swanson's announcement and subsequent statements regarding the sheriff's election created such disruption among the deputies that he was required to curtail Swanson's speech in order to promote the efficient operation of the Plymouth County Sheriff's Office. Finally, in the in the alternative, Van Otterloo asserts that he is personally shielded from liability by the doctrine of qualified immunity.

As an initial matter, the court observes that the peculiar facts surrounding Swanson's First Amendment claim have given rise to a battle not only over the merits, but also over the proper characterization of the claim. Specifically, the parties have put the court to the task of determining whether Swanson's claim is properly analyzed as a patronage dismissal or as a free speech claim.[11] For the reason set forth below, the court concludes that the factual scenario presented here requires the court to analyze Swanson's claim under both theories.

### 1. Patronage dismissals: The Elrod–Branti rule

■ More than twenty years ago, the United States Supreme Court made clear that the wholesale practice of dismissing public employees on the basis of their political affiliation—patronage dismissals—is prohibited by the First Amendment of the United States Constitution. *Elrod v. Burns,* 427 U.S. 347, 359, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion). The Court observed that political patronage inhibited not only freedom of belief and association, but also the "free functioning of the electoral process":

> Conditioning public employment on partisan support prevents support of competing political interests. Existing employees are deterred from such support, as well as the multitude seeking jobs. As government employment, state or federal, becomes more pervasive, the greater the dependence on it becomes, and therefore the greater the power to starve political opposition by commanding partisan support, financial and otherwise. Patronage thus tips the electoral process in favor of the incumbent party, and where the practice's scope is substantial relative to the size of the electorate, the impact on the process can be significant. Our concern with the impact of patronage on political believe [sic] and association does not occur in the abstract, for political belief and association constitute the core of those activities protected by the First Amendment.

*Id.,* 427 U.S. at 354. Despite its ban on across-the-board patronage dismissals, *Elrod* recognized an exception for employees occupying policymaking decisions. *Id.* at 366.

■ The policymaking exception established in *Elrod* was later refined by the Court in *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). Surveying Supreme Court precedent in the area of patronage dismissals, the Eighth Circuit Court of Appeals observed that "in *Branti,* the Court modified the *Elrod* standard by stating that the ultimate inquiry is not whether the employee is a policymaker." *Billingsley v. St. Louis County,* 70 F.3d 61, 63 (1995) (citing *Branti,* 445 U.S. at 518). Rather the pertinent inquiry, as refined in *Branti,* is whether "party affiliation is essential for effective performance of the particular job." *Id.* (citing *Branti,* 445 U.S. at 518). The *Branti* Court summarized the question as follows:

> [T]he ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropri-

---

11. Under either analysis, both parties contend that they are entitled to summary judgment.

ate requirement for the effective performance of the public office involved.

*Branti,* 445 U.S. at 518.

This case is not factually akin to garden variety patronage dismissal suits. Ordinarily, it appears that patronage dismissal cases involve plaintiffs who have been terminated not because they exercised their right to free speech or otherwise engaged in some form of protected activity, but because the newly-elected official wanted to "clean house" by bringing in his or her "own people." Here, it appears that Van Otterloo sought not to "clean house" but to "eliminate the competition." Nevertheless, the parties are convinced that this is, at least in part, a patronage dismissal case. The court agrees, and will therefore consider the parties' motions under the standards articulated in *Elrod* and refined in *Branti.*

### 2. Application of the Elrod–Branti rule

Once a plaintiff has established that he or she was discharged because of political affiliation, the defendant must show that the plaintiff's job falls within the exception created in *Elrod* and refined in *Branti. See Branti,* 445 U.S. at 517–18. The undisputed facts reflect that Van Otterloo placed Swanson on "inactive status" at least in part because of Swanson's intention to run against him in the 1996 election. The burden therefore shifts to Van Otterloo to establish that political affiliation was essential to the effective performance of Swanson's duties as a special deputy for the Plymouth County Sheriff's Office. *See Branti,* 445 U.S. at 517–18; *see also Hall v. Tollett,* 128 F.3d 418, 423 (6th Cir.1997) (discussing burdens of proof in a First Amendment patronage dismissal case).

The only information contained in the record regarding a special deputy's duties was provided in Van Otterloo's affidavits. Specifically, Van Otterloo states that special deputies are assigned essentially the same duties delegated to regular deputies:

a. Protect life and property;

b. Carry out specific duties and responsibilities assigned to them;

c. Carry out any duty required by lawful order; and

d. Within a reasonable time, report and/or take proper action in any situation encounter which requires police action.

Affidavit of Mike Van Otterloo ¶ 3. Van Otterloo asserts that these duties are "not merely technical or administrative but includ[e] direct contact with citizens and the Sheriff's constituents." In an affidavit submitted on the eve of oral arguments, Van Otterloo further states the following regarding the duties of special deputies:

Many [sheriff's duties] can be and are delegated to deputies, in addition to [the deputies'] general patrol duties, public relation duties, public speaking, and crime prevention duties.

The deputies are out in the county contacting people, serving as the Sheriff's eyes and ears and gathering information so he can do his job so it is important that they be loyal to him so that they pass on accurate and important information.

Supplement To Affidavit of Mike Van Otterloo ¶ 2.

The court finds these assertions to be unavailing. As an initial matter, although there can be little doubt that in the course of duty a special deputy will in fact come in contact with citizens of the county, there is no evidence in this record suggesting that opposing a sheriff in a distant election would in any way hinder a special deputy from effectively performing the above-listed tasks. Moreover, the undisputed facts presented here reveal that even in his heyday as a special deputy, Swanson only worked on an "as needed" basis when shifts needed to be covered. Under these circumstances, Van Otterloo's assertion that Swanson would have any meaningful contact with Van Otterloo's "constituency" is highly suspect. In sum, the court is compelled to conclude that Van Otterloo has failed to demonstrate that a special deputy working in the Plymouth County Sheriff's Office occupies a position for which political affiliation is an appropriate requirement.

Moreover, although Van Otterloo may well believe that political affiliation is an appropriate requirement for a special deputy position, the court finds that the Iowa Legislature has

pronounced a contrary view. Iowa Code § 341A.18 provides, in pertinent part, that:

A person shall not be appointed or promoted to, or demoted or discharged from, any position subject to civil service, or in any way favored or discriminated against with respect to employment in the sheriff's office because of the person's *political* ... opinions or affiliations ...

IOWA CODE § 341A.18.

At a minimum, § 341A.18 reflects the Iowa legislature's determination that political affiliation is not an appropriate requirement for employment as deputy sheriff. Van Otterloo asserts that although regular deputy sheriffs are indeed protected from patronage dismissals, special deputies are not included because they are not afforded the civil service protections extended to regular deputy sheriffs. The court finds this argument unavailing. Van Otterloo has gone to great lengths to demonstrate that part-time special deputies engage in the same activities as regular deputies. Presumably, therefore, special deputies occupy the same position as regular deputies for purposes of ascertaining whether their duties are of the nature that political affiliation can reasonably be said to be an appropriate requirement for their position. Van Otterloo has simply failed to identify any characteristic of the special deputy position that would entitle its occupants to less protection from patronage dismissals than their full-time counterparts because at most, special deputies perform the same duties as regular deputies. Moreover, the fact that special deputies perform their duties on an "as needed" or part-time basis suggests that their activities are even more attenuated to the sheriff than the activities of regular deputies who have daily contact with both the sheriff and the public. In sum, the court concludes that Van Otterloo's actions regarding Swanson's employment status with the Plymouth County Sheriff's Office did not constitute a constitutionally permissible patronage dismissal under the standard set forth in *Branti.*

### 3. Qualified immunity

Having concluded that Van Otterloo's placement of Swanson on inactive status was not a constitutionally permissible patronage dismissal, the court must next examine Van Otterloo's contention that he is nevertheless shielded from personal liability for any First Amendment violation by virtue of the qualified immunity defense.

### a. Procedural bar

As indicated previously, Van Otterloo failed to raise the affirmative defense of qualified immunity in any of the three answers filed by the defendants, instead opting to assert the defense in his motion for summary judgment. Van Otterloo subsequently moved the court for leave to amend his answer. On January 14, 1997, Judge Zoss denied the motion for leave to amend observing that the deadline for amending pleadings had long since passed. The defendants appealed Judge Zoss's denial of their motion for leave to amend on January 14, 1998. By Order dated January 31, 1998, this court overruled the defendants' appeal and affirmed Judge Zoss's order denying the defendants motion for leave to amend to assert the additional affirmative defense of qualified immunity.

### b. The merits

Even if Van Otterloo was entitled to assert the defense of qualified immunity at this late date, a scenario the court has previously foreclosed, Van Otterloo would not prevail on the merits of the defense. The Eighth Circuit Court of Appeals recently made the following observations regarding the use of qualified immunity in § 1983 actions:

Once a defense of qualified immunity is raised, a plaintiff must offer "particularized" allegations of unconstitutional or illegal conduct. *See Anderson v. Creighton,* 483 U.S. 635, 639–40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.,* 483 U.S. at 640. The official is not required to guess the direction of future legal decisions, *see Mitchell v. Forsyth,* 472 U.S. 511, 535, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), but must rely on preexisting case law for guidance. *See Coffman v. Trickey,* 884 F.2d 1057, 1063 (8th Cir. 1989). Whether any individual will be held liable for official actions "turns on the 'ob-

jective legal reasonableness' of the action". *Id.* (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

*Conrod v. Davis,* 120 F.3d 92, 95–96 (8th Cir.1997). Van Otterloo's contention that he is shielded by qualified immunity triggers the following three-pronged inquiry:

> (1) whether Swanson has asserted a violation of a constitutional or statutory right; (2) if so, whether the right was clearly established at the time of the violation; and (3) whether, given the facts most favorable to Swanson, there are no genuine issues of material fact as to whether a reasonable official would have known that the alleged action violated the right.

*Burnham v. Ianni,* 119 F.3d 668, 673–74 (8th Cir.1997) (citing *Yowell v. Combs,* 89 F.3d 542, 544 (8th Cir.1996)).

■ As to the first prong of the inquiry, the court has previously concluded that the position of special deputy does not fall within the exception for patronage dismissals. *See Branti,* 445 U.S. at 518. Therefore, the court finds that Swanson has stated a claim for a constitutional violation. *See, e.g., Elrod,* 427 U.S. at 356 (observing that "political belief and association constitute the core of those activities protected by the First Amendment.").

Under the second prong of the qualified immunity analysis, Van Otterloo must prove that Swanson's First Amendment rights were not clearly established. *See Burnham,* 119 F.3d at 674 (citing *Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *Watertown Equip. Co. v. Norwest Bank Watertown,* 830 F.2d 1487, 1490 (8th Cir.1987)). In other words, Van Otterloo must demonstrate that the state of the law regarding patronage dismissals of special deputies was not clearly established at the

time he placed Swanson on "inactive status." [12] Van Otterloo offers two related arguments in support of his contention that the law in this area was "far from clear" at the time he took action against Swanson. First, he contends that the Eighth Circuit Court of Appeals had not addressed this precise issue as of 1994. Second, Van Otterloo points to an apparent split among various circuit courts of appeal addressing the discrete issue of patronage dismissals of deputy sheriffs. [13]

Van Otterloo is correct in his assertion that to date, and certainly as of the 1993–94 time frame at issue, the Eighth Circuit Court of Appeals has not addressed precisely the constitutionality of a deputy sheriff patronage dismissal. However, the Circuit Court has addressed patronage dismissals in other contexts. *See, e.g., Johnson v. City of West Memphis,* 113 F.3d 842, 844 (8th Cir.1997) (determining that general manager of utility commission was subject to patronage dismissal and observing that general manager's responsibilities "encompass areas of city decisionmaking that could be influenced by his partisan viewpoints; [and, therefore] put a premium on allegiance to the mayor."); *Bauer v. Bosley,* 802 F.2d 1058 (8th Cir. 1986), *cert. denied,* 481 U.S. 1038, 107 S.Ct. 1976, 95 L.Ed.2d 816 (1987) (concluding that political affiliation was an appropriate requirement for a staff legal assistant who advises circuit clerk regarding legal and personnel matters, and who represents the clerk in judicial and administrative proceedings); *Barnes v. Bosley,* 745 F.2d 501, 505 (8th Cir.1984), *cert. denied,* 471 U.S. 1017, 105 S.Ct. 2022, 85 L.Ed.2d 303 (1985) (holding that political affiliation was not an appropriate requirement for employees performing ministerial duties in a clerk of court's office). Not surprisingly, the parties hotly contest the significance of these decisions to the issue presently before the court. [14]

12. Determining whether the law regarding patronage dismissals of deputy sheriffs was clearly established at the time Van Otterloo placed Swanson on inactive status is a matter properly decided by the court. *See Darnell v. Ford,* 903 F.2d 556, 562 (8th Cir.1990) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

13. Prior to oral arguments, the court advised the parties of an apparent circuit split regarding patronage dismissals of deputy sheriffs. The

court afforded the parties additional time to brief the question of what significance, if any, these non-binding authorities had on the matters pending here. Both parties accepted the court's invitation to supplement their briefs as to this issue.

14. Swanson has also cited the decisions of *Darnell v. Ford,* 903 F.2d 556 (8th Cir.1990); *Buzek v. County of Saunders,* 972 F.2d 992 (8th Cir. 1992); and *Duckworth v. Ford,* 995 F.2d 858 (8th Cir.1993), in support of its argument that Eighth Circuit law regarding patronage dismissals was

In a relatively recent patronage dismissal case, the Eighth Circuit Court of Appeals made the following observations about patronage dismissals in this circuit:

> It is clear, then, that under *Barnes* a government worker who performs technical, ministerial tasks cannot be discharged based on his political beliefs. *Bauer* established that a government worker who is in a confidential position can be dismissed on account of his political affiliation. Between these two polar positions, however, a broad range of positions exists for which there are no clear guidelines.

*Billingsley*, 70 F.3d at 64. In *Billingsley*, the court determined that a county council administrative assistant did not, under existing law, have a clearly established right to be protected from patronage dismissals. *Id.* In reaching this conclusion, the court reasoned that the defendant councilman could reasonably have believed that his assistant's duties were not "merely technical." The court observed that the assistant "was the sole intermediary between [the councilman] and his constituents" and that she "performed a broad range of duties that dealt with sensitive issues ranging from proposed legislation to county development projects." *Id.* Under those circumstances, the court found that the councilman could reasonably have assumed

that the assistant's position was "confidential in nature" in that his decision "to select an assistant in whom he had complete confidence and trust was not clearly prohibited."

Relying on *Billingsley*, Van Otterloo asserts that the position of special deputy sheriff falls within the "broad range of positions ... for which there are no clear guidelines." The court rejects this assertion. As the court has already discussed, although Van Otterloo may well desire his deputy sheriffs to share his political affiliations, the Iowa Legislature has seen fit to extend protection to deputy sheriffs who possess differing political views. *See* IOWA CODE § 341A.18. The import of Iowa Code § 341A.18 here is clear—Van Otterloo was not entitled to execute a patronage dismissal against any of the regular deputies employed in the sheriff's office. The court finds Van Otterloo's contention that he believed he could fire a lesser-ranked employee (i.e. a special deputy) on the basis of political affiliation to be implausible. It is the nature of the position that is at issue—not whether the position is covered by civil service protections as Van Otterloo appears to assert. Accordingly, the court concludes that Van Otterloo could not reasonably have believed that Swanson's termination for political reasons was proper. Therefore, if he could assert it, Van Otterloo would not be shielded from liability by the doctrine of qualified immunity.[15]

well-established at the time in question. The court observes that although these decisions confirm that a public employee may not be punished for engaging in constitutionally protected expression, they shed no light on the *exception* at issue here—namely, what employees are subject to dismissal under the *Branti* exception to the general ban on patronage dismissals.

**15.** Because the court has resolved the qualified immunity issue first on procedural grounds, and in the alternative, on the merits of the defense, it need not reach Van Otterloo's second argument concerning the apparent split of authority among various courts of appeals regarding the patronage dismissal of deputy sheriffs. The court does note in passing that various circuit courts of appeals have reached conflicting decisions in this area. *See and compare, Jenkins v. Medford,* 119 F.3d 1156, 1162 (4th Cir.1997) (en banc) (holding that political affiliation is an appropriate requirement for deputy sheriffs because "[d]eputy sheriffs play a special role in implementing the sheriff's policies and goals."); *Upton v. Thompson,* 930 F.2d 1209, 1218 (7th Cir.1991), *cert. denied,* 503 U.S. 906, 112 S.Ct. 1262, 117

L.Ed.2d 491 (1992) (observing "that deputy sheriffs operate with a sufficient level of autonomy and discretionary authority to justify a sheriff's use of political considerations ..."); *Terry v. Cook,* 866 F.2d 373, 377 (11th Cir.1989) (noting that under Alabama law, the relationship between sheriffs and their deputies "necessitates the sheriff's absolute authority over [the deputies'] appointment and/or retention.") with *Burns v. County of Cambria,* 971 F.2d 1015, 1023 (3d Cir.1992), *cert. denied,* 506 U.S. 1081, 113 S.Ct. 1049, 122 L.Ed.2d 357 (1993) (holding that the defendant "failed to demonstrate that firing deputy sheriffs for their political affiliation or activities comes within the narrow exception for political dismissals recognized in *Branti* and *Elrod.*"); *see also Hall v. Tollett,* 128 F.3d 418, 427–30 (6th Cir.1997) (surveying the various circuit courts' of appeals decisions on the patronage dismissals of deputy sheriffs and concluding that under the record presented, a "Cumberland County deputy sheriff does not fall within the *Branti* exception for patronage dismissals."). One observation is important here. The existence and effect of Iowa Code § 341A.18, clearly distinguishes the cases finding that deputy sheriffs may be properly discharged for patronage reasons.

### 4. Free speech: The Pickering test

The conclusion that Swanson was indeed protected from a patronage dismissal does not end the court's inquiry on Swanson's First Amendment claim. As the court indicated above, this case presents a hybrid of patronage dismissal allegations as well as infringements upon the right to free speech. Swanson complains that no adverse action was taken against him until he began to make it known that he intended to challenge Van Otterloo in the 1996 election. Van Otterloo counters this argument with the assertion that he placed Swanson on "inactive status" in part because Swanson's "campaign to replace [him] as sheriff was causing divisions in the department."

 The Eighth Circuit of Appeals has instructed the district courts to employ a "two-step inquiry" when considering claims by public employees who contend that they have been discharged for exercising their right to free speech. *See, e.g., Burnham,* 119 F.3d at 678; *Kincade v. City of Blue Springs, Mo.,* 64 F.3d 389, 395 (8th Cir.1995), *cert. denied,* 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996); *Tyler v. City of Mountain Home, Arkansas,* 72 F.3d 568, 569–70 (8th Cir.1995); *Dunn v. Carroll,* 40 F.3d 287, 291 (8th Cir.1994); *Shands v. City of Kennett,* 993 F.2d 1337, 1342 (8th Cir. 1993), *cert. denied,* 510 U.S. 1072, 114 S.Ct. 880, 127 L.Ed.2d 75 (1994). At the first step, the court must determine whether the public employee's speech can be " 'fairly characterized as constituting speech on a matter of public concern.' " *Shands,* 993 F.2d at 1342 (quoting *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)); *Bausworth v. Hazelwood Sch. Dist.,* 986 F.2d 1197, 1198 (8th Cir.1993). If so, the court proceeds to the second step at which it must balance the employee's interest in commenting upon matters of public concern against the interest of the government employer "in

promoting the efficiency of the public services it performs." *Tyler,* 72 F.3d at 570.

### a. Application of the Pickering test

 As to the first inquiry, the court finds that Swanson's speech was a matter of public concern. "An employee's speech touches upon a matter of public concern when it is a 'matter of political, social, or other concern to the community' at large." *Kincade,* 64 F.3d at 396 (quoting *Connick,* 461 U.S. at 146). The parties do not seriously dispute that Swanson's announcement and statements regarding his desire to challenge Van Otterloo in the 1996 election constitute matters of political concern. The fact that Swanson's speech was motivated at least in part by his own self-interest—becoming sheriff—does not lessen its First Amendment protection. *See Darnell v. Ford,* 903 F.2d 556, 563 (8th Cir.1990) (observing that "[o]ne's personal gain from speech does not eliminate constitutional protections from speech that is otherwise political.").

 The court must next address the balancing test articulated in *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), to determine whether Swanson's interest in engaging in the pertinent speech is outweighed by the sheriff's office's interest " 'in promoting the efficiency of the public services it performs through its employees.' " *Hafley v. Lohman,* 90 F.3d 264, 267 (8th Cir.1996) (quoting *Pickering,* 391 U.S. at 568). Under the *Pickering* test, the "primary focus" of the employer's interest element "is to determine whether the speech undermines 'the effective functioning of the public employer's enterprise.' " *Kincade,* 64 F.3d at 397 (quoting *Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)). "Factors relevant in conducting this test are whether the speech creates disharmony in the workplace, impedes the speaker's ability to perform his duties, or impairs working relationships with other employees." *Id.* at 397; *Shands,* 993 F.2d at 1344.[16]

---

**16.** The Eighth Circuit Court of Appeals has described the *Pickering* balancing test as follows: In balancing an employee's and an employer's competing interests, we weigh six interrelated factors: (1) the need for harmony in the office or work place; (2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and coworkers when the speech in question has caused or could cause the relationship to deteriorate; (3) the time, manner, and place of speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties.

Having carefully reviewed the ever-evolving summary judgment record in this case, the court is persuaded that Van Otterloo has generated, though just barely, genuine issues of material fact precluding the court from performing the *Pickering* balancing test at the summary judgment stage of these proceedings. Specifically, through deposition excerpts and the affidavits of deputies Moritz, Bice, Bartolozzi, and police officer Warren Palmer, Van Otterloo has generated genuine issues of material fact regarding what disruption, if any, was caused by or related to Swanson's announcement that he intended to run against him. Van Otterloo has further identified issues of fact as to derogatory statements allegedly made by Swanson about him, as well as about the sheriff's department as a whole.

Although the court will ultimately be required to determine as a matter of law whether Swanson's speech was protected by the First Amendment, the factual disputes generated by Van Otterloo preclude the court from conducting the *Pickering* balancing test at the summary judgment phase. *See Shands*, 993 F.2d at 1342 (observing that "[a]ny factual disputes concerning whether the plaintiff's speech is protected ... should be submitted to the jury ..."). Once a jury has determined these factual issues, the court must "combine the jury's factual findings with its legal conclusions in determining whether [Swanson's] speech is protected." *Shands*, 993 F.2d at 1337 (citing *Lewis v. Harrison Sch. Dist. No. 1*, 805 F.2d 310, 315 (8th Cir.1986), *cert. denied*, 482 U.S. 905, 107 S.Ct. 2481, 96 L.Ed.2d 374 (1987)).

### b. Qualified immunity

The same procedural bar which prevented Van Otterloo from relying upon the affirmative defense of qualified immunity under the patronage dismissal analysis applies with equal force to the court's consideration of Swanson's First Amendment claim under a free speech analysis. Accordingly, the court

need not address the merits of qualified immunity as to Swanson's free speech claim.

### C. Municipal Liability

 Plymouth County argues that it is entitled to summary judgment on all claims against it on the grounds that it cannot be liable under section § 1983 for injuries inflicted solely by its employees under a theory of respondeat superior.[17] The plaintiffs concede as much, however they contend that their claims against Plymouth County are not premised upon the doctrine of respondeat superior but rather upon a theory of municipal liability.

### 1. Requisites for imposing municipal liability

 Analysis of a § 1983 claim against a municipality, in this case Plymouth County, requires the court to resolve two issues: First, whether the plaintiffs' harm was caused by a constitutional violation and second, whether the Plymouth County is responsible for that violation. *See, e.g., Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *Oklahoma City v. Tuttle*, 471 U.S. 808, 817, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

 Recently, the Eighth Circuit Court of Appeals observed that "a plaintiff seeking to impose [municipal liability] is required to identify either an official policy or a widespread custom or practice that caused the plaintiff's injury." *Springdale Education Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir. 1998) (citing *Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, ——, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997)); *accord Kinman v. Omaha Pub. Sch. Dist.*, 94 F.3d 463, 467 (8th Cir.1996); *McGautha v. Jackson County, Mo., Collections Dep't*, 36 F.3d 53, 55–56 (8th Cir.1994), *cert. denied*, 515 U.S. 1133, 115 S.Ct. 2561, 132 L.Ed.2d 814 (1995). The purpose of this is to ensure that a municipali-

---

*Bowman v. Pulaski County Special Sch. Dist.*, 723 F.2d 640, 644 (8th Cir.1983) (citing *Connick*, 461 U.S. at 151–54.).

**17.** Plymouth County is, of course, correct in this assertion. It is axiomatic that under § 1983, a local government cannot be held liable on a

theory of respondeat superior. *Springdale Education Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir.1998) (citing *Andrews v. Fowler*, 98 F.3d 1069, 1074 (8th Cir.1996) in turn citing *Monell v. Department of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

ty is exposed to liability only for constitutional violations " 'resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality.' " *Id.* (quoting *Brown*, 520 U.S. at ——, 117 S.Ct. at 1388, 137 L.Ed.2d 626).

 Where official policy is lacking, municipal liability may be established "through proof that the alleged misconduct was so pervasive among the non-policy making employees of the municipality 'as to constitute a "custom or usage" with the force of law.' " *McGautha* 36 F.3d at 56 (quoting *Monell*); *Jiles v. Ingram*, 944 F.2d 409, 413 (8th Cir.1991) ("Disparate treatment by a governmental entity may be proven by pattern and practice evidence."); *Catlett v. Missouri Highway & Transp. Comm'n*, 828 F.2d 1260, 1265 (8th Cir.1987), *cert. denied*, 485 U.S. 1021 (1988). The rationale for this requirement is that it prevents a municipality from escaping liability by improperly delegating policy-making responsibility. *Id.* Although municipal liability for violating federal constitutional rights may arise from a single act of a policy maker, *see Pembaur v. Cincinnati*, 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), municipal liability for an unconstitutional custom or usage cannot arise from a single act. *McGautha*, 36 F.3d at 56 (citing *Wedemeier v. City of Ballwin*, 931 F.2d 24, 26 (8th Cir.1991)).

#### 2. *Adequacy of the pleadings*

 Having carefully and liberally reviewed the plaintiffs' amended complaint, the court finds that with the exception of Ken Swanson's First Amendment claim, the amended complaint does not allege that any of the plaintiffs' constitutional injuries were the result of an official policy or widespread custom of Plymouth County for which it may held liable. To the contrary, in Counts I, II and III, the plaintiffs pleaded their claims against Plymouth County "pursuant to the

doctrine of respondeat superior." [18] Clearly allegations of this nature fail to state a claim for which relief can be granted under § 1983 against Plymouth County. *See Springdale Education Ass'n*, 133 F.3d 649, 651 (8th Cir. 1998).

#### 3. *Was Van Otterloo a final "policymaker?"*

Although the plaintiffs' pleading on this issue is less than an exemplar of clarity, a liberal construction of Swanson's claim leads the court to the conclusion that Swanson has in fact alleged a claim for municipal liability arising from his termination by Van Otterloo. Specifically, Swanson alleges that Van Otterloo, acting as the Sheriff of Plymouth County, terminated him in violation of his First Amendment rights.[19]

 In *Williams v. Butler*, 863 F.2d 1398, 1402 (8th Cir.1988), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989), the Eighth Circuit Court of Appeals made the following observations regarding policymaking authority, for which a municipality may be held liable, and discretionary authority, for which it may not:

> [A] very fine line exists between delegating final policymaking authority to an official, for which a municipality may be held liable, and entrusting discretionary authority to that official, for which no liability attaches. The distinction, we believe, lies in the amount of authority retained by the authorized policymakers. A clear message from *Paprotnik* is that an incomplete delegation of authority—i.e., the right of review is retained—will not result in municipal liability, whereas an absolute delegation of authority may result in liability on the part of the municipality.

*Williams*, 863 F.2d at 1402.

 This case presents a classic example of a municipality delegating final decision

---

**18.** Specifically, in Count I, Jeanne and Kellogg allege that "Defendants Bice, Moritz, Van Otterloo and Bartolozzi committed said violations of 42 U.S.C. § 1983 while the Defendant Plymouth County was their employer and thus Plymouth County is liable for the actions and violations of Van Otterloo, Moritz, Bice, and Bartolozzi pursuant to the doctrine of respondeat superior." First Amended Complaint ¶ 25. The identical

allegation appears in Swanson's claim for violations of equal protection (Count II) and again in all three plaintiffs' claims for due process infringements (Count III).

**19.** Swanson also alleges a respondeat superior theory of liability against the county. Plainly no such liability exists and will not be considered further by the court.

making authority to one of its officials. The parties agree that Van Otterloo had the sole authority to hire and fire special deputies such as Swanson. The parties further agree that Swanson had no formal avenue by which to appeal or otherwise challenge Van Otterloo's decision. In other words, the Plymouth County Board of Supervisors retained no right of review over Van Otterloo's actions. Under these facts, it is readily apparent that when Van Otterloo placed Swanson on "inactive status" he was acting, for all practical purposes, as the county. By delegating this type of final policymaking authority to Van Otterloo, Plymouth County "exposed itself to liability for any unconstitutional actions" Van Otterloo may have taken pursuant to that authority. *See Williams*, 863 F.2d at 1403.

█ Of course this does not mean that municipal liability will necessarily be established in this case. Swanson must first prove that he suffered a constitutional violation as a result of Van Otterloo's placement of him on "inactive status." As the court has previously concluded, genuine issues of material fact preclude the resolution of Swanson's First Amendment claim at the summary judgment stage of these proceedings. For now, the court simply concludes that if—and only if—Swanson is successful on this claim, Plymouth County is subject to municipal liability for Van Otterloo's actions.

### D. *Jeanne's Remaining § 1983 Claim*

As the court indicated in the Introduction and Procedural Background portion of this opinion, Jeanne has abandoned her due process claim brought pursuant to § 1983 by conceding that she has no identifiable property or liberty interest entitling her to due process protections. As a result, her only remaining claim is for violations of her First Amendment rights. Defendant Plymouth County asserts two arguments in support of its motion for summary judgment on this claim. First, Plymouth County contends that Jeanne has failed to state a claim for which relief can be granted against it because she has premised her claim on a theory of respondeat superior liability. Second, Plymouth County asserts that Jeanne is barred from pursuing any claims against it by the settlement and release she voluntarily entered into in resolving her worker's compensation claim against the county.

The court need not consider the effect of the settlement and release on Jeanne's First Amendment claim against Plymouth County because, as the court has previously discussed, Plymouth County cannot be subject to respondeat superior liability on any claim brought pursuant to § 1983. Furthermore, to the extent Jeanne seeks to impose municipal liability against Plymouth County, she has failed to identify the requisite policy, practice or custom necessary to prevail on such a claim.

### V. CONCLUSION

The parties' cross-motions for summary judgment have raised a variety of issues and have entailed a number of procedural twists and turns. In the pursuit of clarity, the court will summarize its conclusions by claims.

**Defendant Van Otterloo's motion for summary judgment as to Count I is denied, and Swanson's cross-motion for summary judgment on this claim is granted in part and denied in part.** The court finds that Swanson's termination did not amount to a constitutionally permissible patronage dismissal. Accordingly, Ken Swanson's motion for summary judgment is granted to the extent that Van Otterloo is precluded from relying on this defense at trial. Similarly, because he has failed to plead it as an affirmative defense, Van Otterloo is prohibited from relying on the doctrine of qualified immunity. However, the court also finds that genuine issues of material fact preclude summary judgment on Swanson's claim for infringements on his right to free speech.

**Defendant Plymouth County's motion for summary judgment on Counts I, II, and III is granted in part and denied in part.** The court finds that Plymouth County is not entitled to summary judgment on Ken Swanson's First Amendment claim (part of Count I) because Swanson has established that Van Otterloo was a final policymaker sufficient to prevail on a claim of municipal liability. Nevertheless, genuine issues of material fact preclude the court from determining whether Swanson has in fact suffered a

constitutional deprivation. Depending on the resolution of this claim at trial, Swanson may be entitled to assert a claim for municipal liability against Plymouth County. However, **Plymouth County is entitled to summary judgment on the remaining portions of Count I, all of Count II, and all of Count III** on the ground that there is no respondeat superior liability on claims brought pursuant to § 1983.

The court has granted Plymouth County's motion for summary judgment on Jeanne's First Amendment claim (part of Count I) and accordingly, **Jeanne's cross-motion for partial summary judgment is denied as moot.**

 **IT IS SO ORDERED.**