**Larry JOHNSON and Marvin Johnson, Plaintiffs,**

v.

**LAND O' LAKES, INC., Defendant.**

**No. C 96–3079–MWB.**

United States District Court,
N.D. Iowa,
Central Division.

Aug. 10, 1998.

Glenn L. Norris, Hawkins & Norris, Des Moines, IA, for Plaintiffs.

Lawrence A. Moloney, Doherty, Rumble & Butler, Minneapolis, MN, for Defendant.

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

BENNETT, District Judge.

**TABLE OF CONTENTS**

*I. INTRODUCTION* .... 988
*A. Procedural Background* .... 988
*B. Factual Background* .... 989

*II. LEGAL ANALYSIS* .... 993
*A. Standards For Summary Judgment* .... 993
*B. The CEA Claims* .... 994
*1. The principal arguments* .... 994
*2. The supplemental arguments* .... 997
*C. The Tort Claims* .... 1001

*III. CONCLUSION* .... 1002

Yet another "hedge-to-arrive" grain contract case has ripened to the summary judgment stage. Once again, the court is squarely presented with the key question in many such cases, are certain kinds of "hedge-to-arrive" (HTA) contracts illegal off-exchange "futures" contracts under the Commodities Exchange Act (CEA), 7 U.S.C. §§ 1–25, or valid "cash forward" contracts not within the regulatory purview of the CEA? However, the court is also presented with an entirely new question, are all of the producers' tort claims barred by the "economic loss doctrine," because the producers' purely economic damages are properly redressed through contract remedies? Whether the questions presented are old or new, the court must give individualized consideration to them in the circumstances of this case.

## *I. INTRODUCTION*

### *A. Procedural Background*

This lawsuit was commenced as a declaratory judgment action on September 10, 1996, by grain producers Larry Johnson and Marvin Johnson against Land O' Lakes, an agricultural cooperative that operates a grain elevator called the Rockwell Ag Center. In Count I of their complaint, the Johnsons seek declaratory judgment that the HTAs they entered into with the Rockwell Ag Center for the sale and purchase of grain are void, voidable, and unenforceable because they are in irreconcilable conflict with the CEA. The Johnsons also assert claims of fraudulent misrepresentation pursuant to the CEA and common law, negligent misrepresentation, and breach of contract.

Land O' Lakes moved for partial summary judgment on January 15, 1998, on the Johnsons' CEA and common-law tort claims. Land O' Lakes asserts that, as a matter of law, the HTAs the Johnsons entered into with Rockwell Ag Center are not illegal off-exchange futures contracts that violate the CEA, but are instead legal "cash forward" contracts. Land O' Lakes has also moved for summary judgment on all of the Johnsons' tort claims on the ground that they are barred by the "economic loss doctrine," because the Johnsons' purely economic damages are properly redressed through contract remedies. Finally, Land O' Lakes has

moved for summary judgment on the Johnsons' negligent misrepresentation claim, asserting that neither Land O' Lakes nor its employees are properly subject to such a claim. Land O' Lakes offered no argument in support of this final contention, however.

The Johnsons originally resisted Land O' Lakes' motion on March 30, 1998, but the court granted the parties' joint stipulation for withdrawal of that resistance pending depositions of Randy Park, the grain manager of the Rockwell Ag Center. The Johnsons then filed a substituted resistance on June 5, 1998. The Johnsons resisted all three parts of Land O' Lakes' motion. They reiterated their contention that the HTAs violate the CEA and asserted that Iowa's version of the Uniform Commercial Code (UCC) preserves their tort remedies. The Johnsons also noted the lack of any argument or evidence offered by Land O' Lakes in support of Land O' Lakes' contention that it and its employees are not subject to a negligent misrepresentation claim.

In its reply brief, filed June 15, 1998, Land O' Lakes offered no counterargument concerning the economic loss doctrine, and still offered no argument in support of dismissing the negligent misrepresentation claim. Land O' Lakes instead concentrated the entirety of its reply brief on the CEA issue. However, that was not the end of the briefing. On August 7, 1998, when this court was on the brink of filing the present opinion, the Johnsons filed a motion to allow filing of a supplemental brief in support of their resistance to Land O' Lakes' motion for partial summary judgment. In their supplemental brief, the Johnsons present additional relevant authorities concerning the CEA issues, and arguments based thereon, as to which they assert counsel previously had no knowledge. Land O' Lakes has resisted the filing of the supplemental brief as calculated to be prejudicial and fundamentally unfair, coming as it does at the eleventh hour with no prior notice. The court will give separate consideration to the Johnsons' supplemental brief.

The court heard oral arguments on Land O' Lakes' motion for partial summary judgment on July 1, 1998. Plaintiffs Larry and Marvin Johnson were represented by counsel Glenn L. Norris of Hawkins & Norris in Des Moines, Iowa. Defendant Land O' Lakes was represented by counsel Lawrence A. Moloney of Doherty, Rumble & Butler in Minneapolis, Minnesota. The court regrets that an intervening criminal trial delayed the filing of the present ruling, not least because trial in this matter is set to begin on August 26, 1998.

### *B. Factual Background*

The court will discuss here only the nucleus of facts pertinent to the present motion for partial summary judgment. In its legal analysis, the court will address where necessary the parties' assertions of genuine issues of material fact that may preclude summary judgment. The nucleus of pertinent facts begins with an examination of the HTAs the Johnsons have entered into with Land O' Lakes' Rockwell Ag Center.

The contracts are similar in form to the FCC contracts this court discussed in *Oeltjenbrun v. CSA Investors, Inc.,* 3 F.Supp.2d 1044–47, 1998 WL 199042 (N.D.Iowa April 19, 1998).[1] However, there are two slightly different forms of the contract at issue here.

Marvin Johnson's contracts, entered into a few weeks earlier than Larry's, are each in the following form, whether for soybeans or corn, with handwritten entries on blanks excluded, although the court has added paragraph numbers:

> [1.] BUYER and SELLER agree to the following:
>
> [2.] BUYER confirms the following futures transaction was made for seller today on the Chicago Board of Trade, Seller

1. Some, but not all, of the HTAs upon which Land O' Lakes asserts the Johnsons have failed to make delivery are attached to the Johnson's complaint for declaratory judgment. The contracts on which Land O' Lakes asserts the Johnsons have failed to make delivery are identified in the affidavit of Randy Parks, submitted in support of Land O' Lakes' motion for partial summary judgment, and all of those contracts are attached to Land O' Lakes Answer and Counterclaims to Plaintiffs' First Amended Complaint as Exhibits A and B.

agrees that said grain is yet to have the "CASH PRICE" determined for arrival;

[In tabular form:]

QUANTITY ____ BUSHELS ____ GRADE & GRAIN ____ ARRIVAL PERIOD ____ DESTINATION ____ QUALITY ____ FUTURES OPTION ____ FUTURES OPTION PRICE ____

[3.] SELLER states knowledge of cash basis which is the difference between a designated futures option on the Chicago Board of Trade and the cash price of grain for the designated arrival period of this contract. SELLER understands that the *Cash Basis* has not been determined in establishing the "Cash Price" of said grain on arrival.

[4.] SELLER understands that the "Cash Basis" will be the difference between the price quoted for the futures options designated in this contract and the "Cash Price" of the grain for the designated arrival period in this contract on the date and time SELLER elects to set the cash price of said grain.

[5.] SELLER agrees to set the "Cash Basis" and determine the cash value of said grain on or before ______. Unless other terms have been agreed upon by both Buyer and Seller prior to said date, and grain has not been priced by Seller, Buyer is authorized to set the cash basis and to set the cash price of contract.

[6.] Buyer shall be responsible for commissions and margin requirements of this transaction. Buyer agrees that this transaction shall be subject to the rules of the Chicago Board of Trade and the marketing policies of the Buyer.

[7.] SELLER agrees to a service fee of ____ cents per bushel and the service charge will be assessed against the cash price of this contract.

[8.] Failure by the Seller to perform on this contract [sic], Seller shall be subject to all of the terms of the "Grain Purchase Contract and Confirmation" attached to and made a part of this contract.

[9.] This is NOT considered a credit sale contract as long as final price is determined before delivery.

Complaint, Ex. B; Answer and Counterclaim, Ex. B. Of the tabular material in Marvin Johnson's HTAs, only the "Bushels," "Grade & Grain," "Futures Option," and "Futures Option Price" have been filled in. Although each of the contracts refers to a "Grain Purchase Contract and Confirmation" purportedly attached to the HTA, neither Land O' Lakes nor Marvin Johnson has provided the court with a copy of such a document for any of Marvin Johnson's HTAs.

Land O' Lakes contends that Marvin Johnson has failed to make delivery on the following six HTAs: (1) No. 900, dated February 29, 1996, for delivery of 5,000 bushels of soybeans with a "futures option" of November 1996, a "futures option price" of $6.01 per bushel, a deadline of October 30, 1996, to set the cash basis and determine the cash value of the grain, and a service fee of two cents per bushel; (2) No. 926, dated April 19, 1996, for delivery of 5,000 bushels of soybeans with a "futures option" of November 1996, a "futures option price" of $5.87½ per bushel, a deadline of October 31, 1996, to set the cash basis and determine the cash value of the grain, and a service fee of two cents per bushel; (3) No. 933, dated April 19, 1996, for delivery of 20,000 bushels of corn with a "futures option" of July 1996, a "futures option price" of $3.27½ per bushel, a deadline of June 30, 1996, to set the cash basis and determine the cash value of the grain, and a service fee of two cents per bushel; (4) No. 934, dated April 19, 1996, for delivery of 60,000 bushels of corn with a "futures option" of July 1996, a "futures option price" of $2.3917 per bushel, a deadline of June 30, 1996, to set the cash basis and determine the cash value of the grain, and a service fee of two cents per bushel; (5) No. 935, dated April 19, 1996, for delivery of 90,242 bushels of corn with a "futures option" of July 1996, a "futures option price" of $2.51 per bushel, a deadline of June 30, 1996, to set the cash basis and determine the cash value of the grain, and a service fee of two cents per bushel; and (6) No. 936, dated April 19, 1996, for delivery of 70,000 bushels of corn with a "futures option" of July 1996, a "futures option price" of $2.82¾ per bushel, a deadline of June 30, 1996, to set the cash basis and

determine the cash value of the grain, and a service fee of two cents per bushel.

Next to paragraph 7 on all but contract No. 900 of Marvin Johnson's HTAs is a handwritten asterisk and at the bottom of the contract a handwritten notation has been added that "seller understands that if rolled, service fees may vary." Land O' Lakes asserted at oral arguments that this notation was added if the contract was in fact rolled, and the Johnsons did not dispute that characterization at that time. In some cases, predecessor HTAs were "rolled" to the contracts identified above, sometimes with more than one "roll" indicated on the original contract before the "roll" to the contract identified above.[2]

Larry Johnson's HTAs for soybeans, upon which Land O' Lakes contends no delivery has been made, are identical in form to the HTAs Marvin entered into. Like Marvin's, Larry's soybeans HTAs do not have the blanks for "Arrival Period," "Destination," or "Quality" filled in. Larry's soybeans HTAs therefore are as follows: (1) No. 904, dated March 29, 1996, for delivery of 5,000 bushels of soybeans with a "futures option" of January 1997, a "futures option price" of $7.36 per bushel, a deadline of December 31, 1996, to set the cash basis and determine the cash value of the grain, and a service fee of two cents per bushel; and (2) No. 927, dated April 19, 1996, for delivery of 15,000 bushels of soybeans with a "futures option" of November 1996, a "futures option price" of $6.08 per bushel, a deadline of October 31, 1996, to set the cash basis and determine the cash value of the grain, and a service fee of two cents per bushel. Only contract No. 927 bears the handwritten notation concerning service fees if rolled.

Land O' Lakes also contends that Larry Johnson has failed to deliver corn on six HTAs. However, these HTAs are in slightly different form from those entered into by Marvin Johnson or from Larry Johnson's own soybeans HTAs. First, the tabular material after paragraph 2 bears different headings: "Quantity/Bushels," "Grade & Grain," "Moisture," "Futures Option," "Futures Option Price," "Cash Basis," and "Cash Price." Immediately following the table, blanks for "Arrival Period" and "Destination," headings that were in the table in Larry Johnson's soybeans HTAs, have been added, but these blanks are not filled in on any of Larry Johnson's corn HTAs. Finally, to paragraph 5, after the blank for a date for setting cash basis and cash value, the following language has been added: "and deliver no later than __________." However, this blank has not been filled in on any of Larry Johnson's corn HTAs, either. Thus, Larry Johnson's corn HTAs at issue here are as follows: (1) No. 1004, dated April 30, 1996, for delivery of 40,000 bushels of corn with a "futures option" of July 1996, a "futures option price" of $2.51 per bushel, a deadline of June 30, 1996, to set the cash basis and determine the cash value of the grain, and a service fee of two cents per bushel; (2) No. 1005, dated April 30, 1996, for delivery of 15,000 bushels of corn with a "futures option" of July 1996, a "futures option price" of $3.18 per bushel, a deadline of June 30, 1996, to set the cash basis and determine the cash value of the grain, and a service fee of two cents per bushel; (3) No. 1006, dated April 30, 1996, for delivery of 30,000 bushels of corn with a "futures option" of July 1996, a "futures option price" of $3.58 per bushel, a deadline of June 30, 1996, to set the cash basis and determine the cash value of the grain, and a service fee of two cents per bushel; (4) No. 1007, dated April 30, 1996, for delivery of 65,000 bushels of corn with a "futures option" of July 1996, a "futures option price" of $2.34 ½ per bushel, a deadline of June 30, 1996, to set the cash basis and determine the cash value of the grain, and a service fee of two cents per bushel; (5) No. 1008, dated April 30, 1996, for delivery of 50,000 bushels of corn with a "futures option" of July 1996, a "futures option price" of $2.61 per bushel, a deadline of June 30, 1996, to set the cash basis and determine the cash value of the grain, and a service fee of two cents per bushel; and (6) No. 1009, dated April 30, 1996, for delivery of 50,000 bushels of soybeans with a "futures option" of July 1996, a

2. Contract No. 834 was "rolled" to No. 934; No. 835 was "rolled" to No. 935; No. 836 was "rolled" to No. 936; No. 860 was "rolled" to No. 926.

"futures option price" of $2.82¼ per bushel, a deadline of June 30, 1996, to set the cash basis and determine the cash value of the grain, and a service fee of two cents per bushel. Each of Larry Johnson's corn HTAs at issue here bears the handwritten notation that service fees may vary if the contract is rolled. Each of Larry's corn HTAs also bears a handwritten notation that it was "rolled" from a prior HTA.

There is no dispute that, in aggregate, these HTAs exceed the Johnsons' typical annual grain production capacity. Marvin produces on average about 60,000 bushels of corn per year, while Larry produces on average about 65,000 bushels of corn per year. However, both of the Johnsons stated in depositions that their HTAs were on a "multi-year program," anticipating rolling of various contracts so that the Johnsons would ultimately have the capacity to deliver the grain subject to such contracts.[3] However, it is also undisputed that the Johnsons did not have sufficient grain on hand in the spring or summer of 1996 to deliver corn on all of the HTAs scheduled for delivery in July of 1996. Finally, it is undisputed that both of the Johnsons had actually delivered grain on similar contracts in the past: Since March of 1992, Marvin Johnson had delivered at least 105,000 bushels of corn and 32,000 bushels of soybeans pursuant to HTAs; since March of 1993, Larry had delivered at least 116,000 bushels of corn and 15,000 bushels of soybeans pursuant to HTAs.

These HTAs do not expressly provide for "rolling" to a new delivery date at all. However, the parties agree that these contracts were in fact rolled, or that predecessor HTAs were rolled to these contracts. As noted above, the handwritten notation concerning service fees upon rolling was purportedly added only after a roll had actually occurred. Similarly, nowhere do the contracts provide, either expressly or implicitly, for "buyouts." However, the Johnsons asserted in depositions, and Land O' Lakes does not dispute, that they understood that they could buy out the contracts for five cents per bushel plus spread, and later for ten cents per bushel plus spread.

Unprecedented rises in corn prices during 1995 and 1996 meant that cash delivery of grain became more attractive than delivery on HTAs, and many farmers, including the Johnsons, sold their corn for cash and rolled their HTAs. While permitting such rolls, Rockwell Ag Center advised farmers by a newsletter in April of 1996 that "[a]ll hedge to arrive contracts must be a deliverable contract. Rolling these contracts with no intention of delivery is wrong." Subsequently, on June 6, 1996, Rockwell Ag Center sent farmers a letter advising them of two options for meeting their obligations under HTAs. First, farmers could terminate their HTAs on the following terms: (1) they would have to market and deliver the bushels under their HTA contracts to Rockwell; (2) they would have to pay a cancellation fee to Rockwell equal to the difference between the price of the futures contract month and the stated price of the futures contract month at the time of termination, plus ten cents per bushel; and (3) the cancellation charges could be paid by the farmers in equal installments over a period of up to three years with interest at the rate of 9% per year. The second alternative Rockwell offered farmers in the June 6, 1996, letter was "rolling" of their HTAs to a delivery date no later than July of 1997 on the following terms: (1) farmers would have to pay the applicable rolling fees; (2) no rolls would be permitted after April 18, 1997, with basis set no later than June 20, 1997; (3) if farmers did not set the basis by June 20, 1997, Rockwell could price the grain on the next business day after June 20, 1997; and (4) failure to advise Rockwell of the desire to roll by the 25th day of the month preceding the referenced futures contract month would give Rockwell the right to set the basis and cash price on the following business day and delivery would

3. In his deposition, Marvin Johnson explained his "multiyear approach" to be that "you could have those years in front of you, and have—have the floor, and you could, like I said, you could take the higher of the cash price, if the grain would go way up, you took the higher of two prices. If grain went way down, you had a floor. [The floor being] [w]hatever the HTAs were at the time, minus the roll, roll fees, minus the spreads that you either gained or lost." Deposition of Marvin Johnson, p. 95; *accord* Deposition of Larry Johnson, p. 76.

need to occur by the end of the futures contract month. Although almost all of Rockwell's members exercised one or the other of these options, the Johnsons did neither. Instead, this suit for declaratory judgment was commenced in September of 1996.

## *II. LEGAL ANALYSIS*

### *A. Standards For Summary Judgment*

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R. CIV. P. 56 in a number of recent decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1229–32, 1998 WL 49071 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Center,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

> Rule 56. Summary Judgment
>
> (b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.
>
> (c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(b) & (c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394.

Furthermore, in *Coonley v. Fortis Benefit Ins. Co.,* 956 F.Supp. 841 (N.D.Iowa 1997), *aff'd,* 128 F.3d 675 (8th Cir.1997), this court recognized that primarily legal issues generally, and contract interpretation questions specifically, are issues amenable to summary disposition. *Coonley,* 956 F.Supp. at 844; *accord Mansker v. TMG Life Ins. Co.,* 54 F.3d 1322, 1326 (8th Cir.1995) (in an ERISA plan interpretation case, the court observed, "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate," citing *Crain v. Board of Police Comm'rs,* 920 F.2d 1402, 1405–06 (8th Cir.1990)); *Murphy v. Keystone Steel & Wire Co.,* 61 F.3d 560, 564–65 (7th Cir.1995) ("Summary judgment is particularly appropriate in cases involving the interpretation of contracts."); *Mumford v. Godfried,* 52 F.3d 756, 759 (8th Cir.1995) ("Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate."); *McPeek v. Beatrice Co.,* 936 F.Supp. 618, 626 (N.D.Iowa 1996) (ERISA contract interpretation case before the court on summary judgment which quotes *Murphy,* 61 F.3d at 564–65). Similarly, this court has also concluded that statutory interpretation—particularly interpretation of the effect of a statute where facts are undisputed—is primarily a legal question amenable to summary judgment. *See Prudential Ins. Co. of Am. v. Rand &*

Reed Powers Partnership, 972 F.Supp. 1194, 1202–03 (N.D.Iowa 1997), *aff'd*, 141 F.3d 834 (8th Cir.1998); *accord United States v. Carr*, 66 F.3d 981, 983 (8th Cir.1995) (statutory interpretation is a question of law reviewed *de novo*); *United States v. Moore*, 38 F.3d 977, 979 (8th Cir.1994) (the task of statutory interpretation "is one best placed in the hands of the trial judge," because it is a question of law); *United States v. Brummels*, 15 F.3d 769, 771 (8th Cir.1994) (explaining that, while findings of fact are reviewed for clear error, "[a]s to application of facts to the legal interpretation of [a statute], the standard of review is *de novo*"). Thus, because some of the issues before the court are essentially legal—contract and statutory interpretation—summary disposition may be particularly appropriate. *See Coonley*, 956 F.Supp. at 845.

With these standards in mind, the court turns to consideration of Land O' Lakes' motion for partial summary judgment on many of the Johnsons' claims.

### *B. The CEA Claims*

#### *1. The principal arguments*

The question of whether the Johnsons' HTAs are illegal, off-exchange futures contracts in violation of the CEA or valid "cash forward" contracts not governed by the CEA goes not only to summary judgment on the Johnsons' declaratory judgment claim, but to the viability of their CEA fraud claims. In support of its contention that it is entitled to partial summary judgment on all CEA claims, Land O' Lakes contends that the Johnsons' HTAs fall within the "cash forward" contract exception, because the Johnsons' depositions show that they understood the contracts to require delivery; that they have indeed delivered grain on such contracts in the past; that they intended to deliver grain on a multi-year plan; and that their assertion of no intent to deliver is an eleventh hour attempt to generate a genuine issue of material fact by statements in affidavits that are contrary to deposition testimony. The Johnsons assert that they never intended to deliver grain on the HTAs, because of their multi-year plan, and the opportunities to roll or buy out the contracts rather than delivering. They also contend that the HTAs do not specifically require delivery, but instead expressly provided for rolling or buyouts. Finally, the Johnsons assert that nobody expected or intended delivery of their grain on the HTAs in July of 1996, because they had already delivered corn for cash to the Rockwell Ag Center in the early summer of 1996, and their HTAs in aggregate required them each to deliver three to four times as much corn as they grew in an average year.

This court has already discussed in some detail the development of the CEA and its different treatment of "futures" contracts and "cash forward" contracts in *Oeltjenbrun*, 3 F.Supp.2d at 1033–37, 1998 WL 199042. Therefore, the court will not repeat that discussion here. Instead, the court will turn directly to the core question of whether, applying the standards articulated in *Oeltjenbrun* and the decisions upon which it relies, the Johnsons' HTAs do indeed fall within the "cash forward" exception as Land O' Lakes contends in its motion for partial summary judgment. Thus, the factors the court must consider are, first and foremost, whether the contracts contemplate actual physical delivery of grain, measured by an objective obligation to deliver grain and a subjective intent to deliver grain, and secondary considerations, including whether the contracts are between persons engaged in the business of buying and selling grain for actual physical delivery; whether the contracts are between parties capable of making or receiving actual physical delivery of the subject goods; whether the contracts have inherent value to the parties; and the "nature" of the contracts viewed as a whole. *Id.* at 1035–37 & 1045–47, 1998 WL 199042.

As with the FCC HTAs in Oeltjenbrun,the objective delivery obligation in the Johnsons' HTAs with Land O' Lakes is at best implied. *Cf. Oeltjenbrun*, 3 F.Supp.2d at ––, 1998 WL 199042 at *19. The plain language of the contracts only "confirms" that the "Buyer," Rockwell Ag Center, has made a futures transaction on behalf of one or the other of the Johnsons, but that language does not clearly impose a duty on the

Johnsons to deliver any grain. The inferences of a delivery obligation are admittedly weaker here than they were with regard to the FCC contracts in Oeltjenbrun, because unlike the FCC contracts, the provisions for "Arrival Period" and "Destination" in the Johnsons' HTAs have not been filled in, so that it is only by inference that the arrival period is the same as the futures option month and the destination is the Rockwell Ag Center. However, an objective delivery obligation is nonetheless implied from the fact that the contracts, taken as a whole, establish a pricing mechanism for grain upon "arrival" or "delivery," occurrences that are mentioned in paragraphs 2, 3, 4, and 9 of all the HTAs, and in paragraph 5 of Larry Johnson's corn HTAs. Furthermore, the contract specifies terms in paragraph 9, concerning whether or not the contract is a credit sale contract, that are only relevant to the actual delivery of grain. Although the Johnsons contend that the HTAs do not specifically require delivery, because they instead expressly provide for rolling or buyouts, there are no express provisions for rolling or buying out the contracts anywhere within the four corners of the HTAs. Again, at least until the filing of their supplemental brief, the Johnsons had failed to dispute Land O' Lakes' assertion that the handwritten notation that the service charge may vary if the contracts were rolled was added only if a contract was indeed rolled by separate agreement.

However, even assuming that the contracts provided or implied the opportunity to roll or buy out, that would not negate the delivery obligation, as this court has held in *Oeltjenbrun.* Rolling of the Johnsons' HYAs, or a buyout of the contracts, is similar to the "bookout" agreements the Ninth Circuit Court of Appeals found the CFTC countenanced in *In re Bybee,* 945 F.2d 309, 314 (9th Cir.1991). Like "bookout" agreements, the agreements to roll or buy out these contracts were separate, individually negotiated, new agreements; there was no obligation or arrangement to enter into rolls or to allow buyouts in the original contracts; the agreements to roll or to buy out were not provided for by the terms of the contracts as initially entered into; and Rockwell Ag Center was entitled to demand delivery, and the Johnsons were entitled to make delivery, pursuant to the terms of the original contract. *In re Bybee,* 945 F.2d at 314 (citing *Statutory Interpretation Concerning Forward Transactions,* 55 Fed.Reg. 39188, 39192 (Sept. 25, 1990), which concluded that, for these reasons; "bookout" agreements did not negate the delivery requirement and did not change cash forward contracts into illegal futures contracts). Furthermore, the obligation to make actual delivery of corn after the rolls remained just as real and binding as the delivery obligation was in the original contract, because, since terms permitting rolling are absent from the HTAs, rolling was a matter of forbearance by Rockwell Ag Center on a demand for timely delivery, not a matter of right by the Johnsons. Whether or not the Johnsons were told that they had a right to roll or buy out the contracts is a factual dispute that may go to their fraud claim, not their CEA claims, when the contracts are themselves silent on rolling and buyouts. Indeed, even in light of his understanding of opportunities to roll or buy out his HTAs, Marvin Johnson acknowledged in his deposition testimony that he had an obligation to deliver grain on his HTAs "sooner or later." Deposition of Marvin Johnson, pp. 144–45; *see also id.* at p. 138 ("I intended to deliver on the bushels. You don't get into these without intending to deliver on the bushels.").

The Johnsons, however, have asserted that there is at least a genuine issue of material fact on the second prong of the contemplation-of-delivery factor, their subjective intent to deliver on these contracts. Indeed, they go so far as to assert that they had no such subjective intent, nor could the Rockwell Ag Center, for various reasons. First, the Johnsons assert that they never intended to deliver grain on the date specified in the HTAs, or never intended to deliver grain on their HTAs at all, because of their multi-year plans, and the opportunities to roll or buy out the contracts. This evidence, however, fails to generate a genuine issue of material fact as to intent to deliver. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 ("Only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment."); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394. The only reasonable inference to arise from an assertion that the contract could be deferred by rolling or as part of a multi-year plan, or extinguished by a buyout, is that there was indeed a recognized obligation to deliver grain on the contract that had to be deferred by rolling or extinguished by buying it out.

Next, the Johnsons assert that nobody expected or intended delivery of their grain on the HTAs in July of 1996, because they had already delivered corn for cash to the Rockwell Ag Center in the early summer of 1996, and their HTAs in aggregate required them each to deliver three to four times as much corn as they grew in an average year. However, in their depositions, the Johnsons also state that they and Rockwell Ag Center knew that they were using their HTAs on a "multi-year approach," which contemplated rolling and eventual delivery over several years. Their contention also misses the point, *see Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394, because the question is not whether they intended to make delivery at a specific date, but whether they understood the contracts to require delivery and intended to make delivery pursuant to the contracts, for example, after rolling. Thus, the Johnsons have failed to generate a genuine issue of material fact that they never intended to deliver grain on their HTAs, even though they had delivered their 1995 crop for cash.

The court therefore turns to secondary considerations that go to the question of whether the HTAs are cash forward contracts or illegal futures contracts. *Oeltjenbrun,* 3 F.Supp.2d at 1045–47, 1998 WL 199042. These contracts are also between sellers engaged in the business of producing grain and a buyer engaged in the business of buying grain and they involve individually negotiated terms of amount, price, and delivery date. *Salomon Forex, Inc. v. Tauber,* 8 F.3d 966, 971 (4th Cir.1993) ("cash forwards are generally individually negotiated sales of commodities between principals"), *cert. denied,* 511 U.S. 1031, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994). The Johnsons' assertions that they could only enter into HTAs for bushels of grain in increments of 1,000 or 5,000, as on the CBOT, does nothing to generate a genuine issue of material fact on this factor, because precisely how many increments was still subject to individual negotiation, and at least one of the contracts is for an "odd" amount of 90,242 bushels. *See* Marvin Johnson's HTA No. 935, dated April 19, 1996. Although the Johnsons assert that the price was not negotiated, because it was the price for a specific futures month, they ignore the fact that they chose the futures month, and further controlled the ultimate price by choosing the point at which to set basis. Furthermore, because the contracts are between grain producers and a grain elevator, the contracts were entered into between parties able to make and receive physical delivery of the subject goods. *Salomon Forex, Inc.,* 8 F.3d at 971. The grain contracts clearly have "inherent value" to each of the parties: to the Johnsons because they provide for sale of their crops, indeed, for sale of their crops with a "floor" price for several crop years, *see* Deposition of Marvin Johnson, p. 95; Deposition of Larry Johnson, p. 76; and to the elevator because they provide the source of a supply of grain for the elevator's business. *CFTC v. Co Petro Mktg. Group, Inc.,* 680 F.2d 573, 578 (9th Cir.1982) (examining the "inherent value" of the contract to the parties). Altogether, the "nature" of the contracts is an individual transaction for the purchase and sale—and subsequent actual delivery—of grain.

Indeed, the "nature" of the contract is a pricing mechanism for determining the price of grain upon delivery at a future date. Although Marvin Johnson testified in deposition that he believed the purpose of the HTAs was "speculating," Deposition of Marvin Johnson, p. 139, and that there was no delivery requirement if there was a buyout, *id.,* this testimony fails to generate a genuine issue of material fact that the contracts were not for actual physical delivery of grain. Again, the only reasonable inference to arise

from an assertion that the contract could be bought out is that there was indeed a recognized obligation to deliver grain on the contract that had to be extinguished by buying it out. As a matter of law, the "speculating" the HTAs permitted was as to the precise price upon delivery, not upon whether actual physical delivery was required. Indeed, both of the Johnsons acknowledged that once the farmer set the basis pursuant to an HTA, the contract operated as a cash contract for actual delivery of grain. *See* Deposition of Marvin Johnson, p. 69–70; Deposition of Larry Johnson, p. 60–61.

At oral argument, counsel for the Johnsons asserted that the "fallacy" of this court's prior HTA decisions, and that of the decisions upon which this court relied, is that they construe the "cash forward" exception broadly, while construing the prohibition on off-exchange futures contracts narrowly, when the court should do just the reverse. The court is unpersuaded by this argument, because a contract that is in essence a pricing mechanism for the actual physical delivery of grain in the future fits within the narrow "cash forward" exception, even if the pricing mechanism is tied to some extent to a specified futures price. As this court explained in *Oeltjenbrun,* " '[t]his "narrow" exception [for cash forward contracts] is predicated on both parties contemplating and intending future delivery of the actual commodity when immediate delivery would be commercially impracticable.' " *Oeltjenbrun,* 3 F.Supp. 2d at 1035 (quoting *Commodity Futures Trading Comm'n v. Noble Metals Int'l, Inc.,* 67 F.3d 766, 772 (9th Cir.1995), *cert. denied sub nom. Schulze v. Commodity Futures Trading Comm'n,* — U.S. —, 117 S.Ct. 64, 136 L.Ed.2d 26 (1996), in turn citing *Co Petro,* 680 F.2d at 578; *In re Bybee,* 945 F.2d at 313; and *In re Stovall,* [1977–1980 Transfer Binder], Comm. Fut. L. Rep. (CCH) ¶ 20,941, at 23,-777–778). These HTAs, as a matter of law, are contracts on which both parties contemplated and intended future delivery of the actual commodity when immediate delivery would be commercially impracticable.

Because, as a matter of law, the HTAs the Johnsons entered into with Rockwell Ag Center are valid "cash forward" contracts not within the regulatory purview of the CEA, Land O' Lakes is entitled to summary judgment in its favor on the Johnsons' declaratory judgment claim and their fraud claims pursuant to the CEA.

### 2. *The supplemental arguments*

On August 7, 1998, the Johnsons sought leave to file a supplemental brief in resistance to Land O' Lakes' motion for partial summary judgment in which the Johnsons rely on authorities they assert were previously unknown to their counsel. Land O' Lakes resisted granting leave to file the supplemental brief, because Land O' Lakes contends that at no time prior to the filing of the supplement did counsel for the Johnsons give any indication that such a brief was in the offing, although counsel for the parties were in regular contact concerning pretrial matters and possible settlement. Furthermore, Land O' Lakes points out that none of the additional authorities presented in the supplemental brief are newly decided. Rather, all were available to counsel at the time of oral arguments, and thus arguments based on those authorities have been waived. In short, Land O' Lakes contends that the manner in which the supplemental brief has been proffered to the court is calculated to be prejudicial and fundamentally unfair. However, Land O' Lakes has also taken the precaution of challenging the new authorities and new arguments on their merits.

Although the supplemental brief comes at the eleventh hour, the court is reluctant to disregard potentially relevant authorities and arguments on a question of law, however belatedly proffered, when the ultimate goal of judicial proceedings is a just disposition of the issues presented. Whether the court addresses those arguments now or in a motion to reconsider after it has ruled, it is still preferable, in the long run, that this court address them. Also, Land O' Lakes has availed itself of the opportunity to make a prompt challenge to the supplemental brief on the merits, so that Land O' Lakes will suffer no real prejudice if the court considers the supplemental brief. Therefore, the court will allow the filing of that supplemental brief

and will consider, to the extent they are relevant, the authorities and arguments presented in it.

As the first of their new authorities, the Johnsons rely on the definitions of "forward contract" and "futures contract" in *Dunn v. Commodity Futures Trading Comm'n,* 519 U.S. 465, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997), as demonstrating that the HTAs in question here are futures contracts. In *Dunn,* a case involving foreign currency trading, not grain, the Supreme Court defined "futures contracts" under the CEA as "agreements to buy or sell a specified quantity of a commodity at a particular price for delivery at a set future date." *Dunn,* 519 U.S. at ——, 117 S.Ct. at 916. The Court explained that, as to currency futures,

> [n]o currency changes hands at the time a futures contract is made. And, the existence of a futures contract does not guarantee that currency will actually be exchanged. Indeed, the Commission concedes that, in most cases, futures contracts are "extinguished before delivery by entry into an offsetting futures contract." [Brief of Respondent], at 30 (citing 1 T. SNIDER, REGULATION OF THE COMMODITIES FUTURES AND OPTIONS MARKETS § 2.05 (2d ed.1995) (hereinafter Snider))[.]

*Id.* at ——, 117 S.Ct. at 917. The Court defined "forward contracts," in passing, as "agreements that anticipate the actual delivery of a commodity on a specified future date." *Id.* The Johnsons argue, based on *Dunn,* that their HTAs with Land O' Lakes are futures contracts under these definitions, because the delivery obligation is extinguished and a new obligation is substituted every time the contract rolls, and thus a "specific" delivery date cannot be determined by merely reading the contract owing to the right to roll. For the first time, at the eleventh hour, the Johnsons assert that the handwritten notation that "seller understands that if rolled, service fee may vary" emphasizes a right to roll the contracts. Therefore, they argue, an intent to deliver "sometime" doesn't mean that the contracts "anticipate the actual delivery of a commodity on a *specified* future date." *See Dunn,* 519 U.S. at ——, 117 S.Ct. at 917 (emphasis added).

These arguments fail for several reasons. First, a specific delivery date can be determined by merely reading the contract: It is the futures option month, as is further clarified by the deadline to set cash basis and determine the cash value for the grain. *See* Paragraphs 2 & 5, HTA Contracts. The Johnsons themselves testified in depositions that once the farmer set the basis pursuant to an HTA, the contract operated as a cash contract for actual delivery of grain, and delivery was required within thirty days, although some leniency was normal depending on availability of transportation and whether the elevator was full. *See* Deposition of Marvin Johnson, p. 69–70; Deposition of Larry Johnson, p. 60–61. Second, the Johnsons' interpretation of the HTAs is still founded on their assertion that there was a "right" to roll the contracts and that this "right" to roll substitutes a new delivery date that cannot be determined from the original contract. However, as the court pointed out above, there are no express provisions for rolling or buying out the contracts anywhere within the four corners of the HTAs. To put it bluntly, if there is a "right" to roll these HTAs, that "right" does not come from the HTAs, but from a separate agreement concerning the HTAs. Thus, the original contract, prior to any roll, does state a "specific" delivery date ascertainable from the original contract. The fact that a new delivery date is substituted if the contract is rolled, pursuant to a separate agreement to modify, only means that a new specific delivery date is substituted by modification for the original specific delivery date.[4]

Even accepting the Johnsons' newly asserted position that the handwritten addition of "seller understands that if rolled, service fee may vary"—which the Johnsons had

4. The court also agrees with the Elevators that agreements to "roll" HTAs are modifications, not rescissions, of those HTAs for which consideration, in the form of payment of roll fees on the one hand and acceptance of later delivery on the other, was present. Whether the "roll" was simply noted on the original HTA or embodied in a "new" HTA, it remained a modification of a continuing obligation.

heretofore conceded was only added after a roll had already occurred—emphasizes a "right" to roll the contracts, a "right" to roll does not eliminate the "specific" delivery date in the contract, it merely provides a mechanism to modify that delivery date. The fact that a specific delivery date can be modified does not mean the specific delivery date does not exist under the terms of the contract *prior* to modification. Again, if there is no specific delivery date, there is no need to modify it by rolling.

Next, the Johnsons' assertion that an intent to deliver "sometime" doesn't mean that the contracts "anticipate the actual delivery of a commodity on a *specified* future date" confuses the objective delivery obligation with the subjective intent prong of the "cash forward" contract analysis. *See Oeltjenbrun,* 3 F.Supp.2d at 1035–37, 1998 WL 199042 (considering both an objective obligation to deliver and a subjective intent to deliver). The definition of "forward contract" in *Dunn* was not whether the *parties* "anticipate[d] the actual delivery of a commodity on a *specified* future date," but whether the "*agreements* ... anticipate the actual delivery of a commodity on a specified future date." *Id.* Whether the *agreements* anticipate actual delivery is a question of an objective delivery obligation, and the HTAs in question here do have such a delivery obligation, albeit by implication. Thus, the HTAs in question here *do* "anticipate the actual delivery of a commodity on a *specified* future date," *see Dunn,* 519 U.S. at ——, 117 S.Ct. at 917 (emphasis added), and consequently are "forward contracts" within the meaning of the Johnsons' new authority.

However, the Johnsons also cite new authority for the proposition that this court's reliance on subjective intent to deliver as part of the determination of whether a contract fits within the cash forward contract exception is contrary to the canons of statutory construction announced by the Supreme Court. The Johnsons contend that in *Arkansas Best Corp. v. Commissioner of Internal Revenue Serv.,* 485 U.S. 212, 108 S.Ct. 971, 99 L.Ed.2d 183 (1988), the Supreme Court made clear that consideration of motivation is an improper basis for determining whether property falls within a statutory definition, in that case, within the statutory definition of "capital asset" within the meaning of 26 U.S.C. § 1221. The approach of *Arkansas Best,* the Johnsons contend, is "directly contrary" to the subjective intent prong of the test this court has drawn from decisions of the Ninth Circuit Court of Appeals to determine what is a "cash forward contract" under the exception to the CEA. The Johnsons assert further that, the court's consideration of subjective intent to deliver is contrary to the Iowa rules of contract interpretation, which require that ambiguities be construed against the drafter, and that extrinsic evidence may be used to establish matters on which the contract is silent, if such matters are not inconsistent with the terms of the contract—presumably, the Johnsons mean here a "right" to roll—but may not be used to establish terms that are inconsistent with the written terms—presumably meaning an obligation to deliver here when the contract does not include such an obligation according to the Johnsons.

The Johnsons' argument based on *Arkansas Best* simply tries to prove too much. In *Arkansas Best,* the petitioner asserted that assets acquired or sold for ordinary business purposes rather than for investment should be given ordinary-asset treatment under the tax laws. *Arkansas Best,* 485 U.S. at 216, 108 S.Ct. 971. As the Johnsons contend, the Supreme Court did find that the petitioner's reliance on the "motive" for which a taxpayer held property was an inappropriate basis for determining whether the property was a "capital asset" within the meaning of 26 U.S.C. § 1221. *See Arkansas Best,* 485 U.S. at 217, 108 S.Ct. 971. However, that conclusion was not based on a rule that subjective intent is never relevant, but *because such a "motive" test was contrary to the language of the particular statute in question:*

> This motive test, however, is not only nowhere mentioned in § 1221, but it is also in direct conflict with the parenthetical phrase 'whether or not connected with his trade or business.' The broad definition of the term 'capital asset' explicitly makes irrelevant any consideration of the proper-

ty's connection with the taxpayer's business, whereas petitioner's rule would make this factor dispositive.

*Id.* In contrast, it is precisely the intent of the contract that determines whether it is one for forward delivery, rather than a futures contract, under the CEA: the "cash forward contract" exception of 7 U.S.C. § 1a(11) (formerly 7 U.S.C. § 2, first paragraph), excludes "any sale of any cash commodity for deferred shipment or delivery." The legislative history makes clear that "Congress 'intended to cover [with the case forward exclusion] only contracts for sale which are entered into with the expectation that delivery of the actual commodity will eventually occur through performance on the contracts.'" *In re Bybee,* 945 F.2d at 313 (quoting *Stovall,* 1977–1980 Transfer Binder, Comm. Fut. L. Rep. (CCH) ¶ 20,941, at 23,-777); *accord Noble Metals Int'l, Inc.,* 67 F.3d at 772; *Salomon Forex,* 8 F.3d at 971; *Co Petro,* 680 F.2d at 578.

Nor is it contrary to the Iowa rules of contract interpretation to consider the subjective intent of the parties as to actual delivery in addition to the objective inquiry of whether the contract establishes an obligation to deliver, although the court agrees with the Johnsons that it would be wrong to consider *only* subjective intent. Under Iowa law, in construing a written contract, the intent of the parties controls, *see Kerndt v. Rolling Hills Nat'l Bank,* 558 N.W.2d 410, 416 (Iowa 1997); *see also Howard v. Schildberg Constr. Co., Inc.,* 528 N.W.2d 550, 554 (Iowa 1995) ("Our goal in interpreting [a contract] is to ascertain the meaning and intention of the parties," citing *Power Eng'g & Mfg., Ltd. v. Krug Int'l,* 501 N.W.2d 490, 493 (Iowa 1993)); *Kuehl v. Freeman Bros. Agency, Inc.,* 521 N.W.2d 714, 719 (Iowa 1994) ("In the construction of contracts, the cardinal principle is that the intent of the parties must control."); *Lange v. Lange,* 520 N.W.2d 113, 119 (Iowa 1994) ("Under the cardinal rule of contract construction, the parties' intent controls."), but the parties' intent is determined by what the contract itself says, except in cases of ambiguity. *Id.* (citing Iowa R. App. P. 14(f)(14)); *Howard,* 528 N.W.2d at 554; *Kuehl,* 521 N.W.2d at 719; *Lange,* 520 N.W.2d at 119. Therefore, the court certainly must perform the objective prong of the inquiry first, to determine whether the contract itself establishes an obligation to deliver. This court has made that determination here, concluding that the contracts, as written, establish an obligation to make actual physical delivery of grain, albeit by implication.[5]

In concluding that the contracts establish an obligation to deliver by implication, however, the court did not conclude that the contracts were ambiguous, and therefore should have been construed against the drafter. *See Kerndt,* 558 N.W.2d at 416 (ambiguities in a contract are strictly construed against the drafter of the contract). Consequently, under Iowa rules of contract interpretation, it may well have been unnecessary to consider—in addition to the terms of the HTAs—whether extrinsic evidence established a subjective intent on the part of the parties to make and receive actual physical delivery of grain under the contracts; but, as long as the court did not substitute the subjective inquiry for the objective one, the court has adhered to the Iowa rules of contract interpretation. Furthermore, under Iowa law, the context in which an agreement is made may influence interpretation when appropriate. *See Lewis Central Educ. Ass'n,* 559 N.W.2d at 22; *see also Iowa–Illinois Gas & Elec. Co. v. Black & Veatch,* 497 N.W.2d 821, 825 (Iowa 1993) ("Extrinsic evidence is admissible as an aid to contract interpretation when it throws light on the parties' situation, antecedent negotiations, attendant circumstances, and the objective which the parties were trying to attain."). Therefore, it was not wrong for the court to observe that

5. In concluding that the contract implies an obligation to make actual delivery, the court has also followed the Iowa rule of contract interpretation that the court must seek to give effect to the language of the entire agreement in accordance with its commonly accepted and ordinary meaning. *See Lewis Central Educ. Ass'n v. Lewis Central Community Sch. Dist.,* 559 N.W.2d 19, 22 (Iowa 1997). Thus, the court has given reasonable meanings to the references to "arrival" and "delivery" in the HTAs, rather than rendering those terms superfluous. *Kerndt,* 558 N.W.2d at 416.

the Johnsons' subjective intent to deliver grain pursuant to the HTAs supported the court's conclusion that the HTAs contemplated actual physical delivery of grain as required for the HTAs to fall within the cash forward contract exception to the CEA.

In short, the Johnsons' supplemental authorities and arguments do not require a different result, and even in light of those arguments and authorities, Land O' Lakes is entitled to summary judgment on the Johnsons' CEA claims, because the HTAs in question here are cash forward contracts outside the regulatory purview of the CEA.

### C. *The Tort Claims*

Land O' Lakes has also moved for summary judgment on the Johnsons' tort claims. This portion of Land O' Lakes' motion can be resolved more briefly. Land O' Lakes contends that all of the Johnsons' tort claims are barred by the "economic loss doctrine," because the Johnsons' purely economic damages are properly redressed through contract remedies. The Johnsons argue strenuously that the economic loss doctrine is not applicable here, because the Iowa UCC does not specifically foreclose their tort claims, but instead provides in Iowa Code § 554.1103 that UCC remedies should be "supplemented" by other remedies such as they are seeking. In its reply brief, Land O' Lakes has offered no counterargument concerning the applicability of the economic loss doctrine.

Land O' Lakes relies on *Nelson v. Todd's Ltd.*, 426 N.W.2d 120, 124 (1988), for the applicability of the economic loss doctrine here. However, in a decision handed down after Land O' Lakes filed its motion, the Iowa Supreme Court commented on *Nelson* as follows:

> In support of its contention [that the economic loss doctrine barred application of the comparative fault act to a professional negligence claim], Kemin relies on the federal court decision in *Ethyl Corp. v. BP Performance Polymers, Inc.*, 33 F.3d 23 (8th Cir.1994), applying Iowa law. In that case, the court determined that the comparative fault principles established in chapter 668 did not apply to a breach-of-warranty claim seeking entirely economic losses. The court indicated its belief that under Iowa law a claim for purely economic loss is recoverable only in contract and not in tort. It relied for this conclusion on *Nelson v. Todd's Ltd.*, 426 N.W.2d 120, 123–25 (Iowa 1988). *Our reading of the Nelson decision indicates that it was limited to deciding whether purely economic injuries without accompanying physical injury are recoverable under a theory of strict liability in tort.* *Nelson*, 426 N.W.2d at 123. *The case does not speak to the specialized situation of professional negligence.*

*Kemin Indus., Inc. v. KPMG Peat Marwick LLP*, 578 N.W.2d 212, 220–21, 1998 WL 268794 (Iowa 1998). Thus, *Nelson*, as limited by the Iowa Supreme Court, does not support Land O' Lakes' position here. Land O' Lakes conceded as much at oral arguments. Furthermore, Iowa Code § 554.1103, part of Iowa's version of the UCC, provides that "[u]nless displaced by the particular provisions of this chapter, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, *fraud, misrepresentation*, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions." Iowa Code § 554.1103 (emphasis added). Like the Johnsons, this court can find no cases indicating that the UCC displaces the specific tort claims asserted here. Therefore, that portion of Land O' Lakes' motion for partial summary judgment seeking summary judgment on the Johnsons' tort claims under the economic loss doctrine will be denied.

Similarly, Land O' Lakes' motion for summary judgment on the Johnsons' negligent misrepresentation claim also fails for lack of support. Land O' Lakes has moved for summary judgment on this claim, asserting that neither Land O' Lakes nor its employees are properly subject to a negligent misrepresentation claim. Land O' Lakes offered no argument in support of this final contention in its opening brief, however, and its continued silence on this contention in its reply brief and oral arguments in support of its motion is deafening. On a motion for

summary judgment, the moving party, here Land O' Lakes, bears "the initial responsibility of informing the district court of the basis for [its] motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir.1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir.1993). This Land O' Lakes has failed to do. Therefore, Land O' Lakes is not entitled to partial summary judgment on the Johnsons' negligent misrepresentation claim.

### III. CONCLUSION

The court agrees that Land O' Lakes is entitled to summary judgment in its favor on the Johnsons' declaratory judgment claim and their CEA fraud claims, because the court concludes and declares that the HTAs the Johnsons entered into with Rockwell Ag Center are, as a matter of law, cash forward contracts not within the regulatory purview of the CEA. However, Land O' Lakes' motion for summary judgment on the Johnsons' remaining tort claims must be denied. First, the "economic loss doctrine" is no bar to the Johnsons' tort claims, because the doctrine has been limited by the Iowa Supreme Court to strict liability claims and because Iowa's version of the UCC preserves the tort remedies the Johnsons seek. Second, Land O' Lakes has failed to meet its burden of informing the court of the basis for its motion as to the Johnsons' negligent misrepresentation claim and has failed to identify those portions of the record that show the lack of a genuine issue of material fact as to that claim.

Therefore, Land O' Lakes' motion for partial summary judgment is **granted in part** and **denied in part**, as set forth more fully herein.

Furthermore, the Johnsons' motion for leave to file a supplemental brief in support of their resistance to Land O' Lakes' motion for partial summary judgment is **granted**, and the court has considered that supplemental brief in its disposition of Land O' Lakes' motion for partial summary judgment.

Finally, trial in this matter, currently set for August 24, 1998, is **rescheduled** to begin at 9:00 a.m. on Wednesday, August 26, 1998, at the Federal Courthouse in Fort Dodge, Iowa.

**IT IS SO ORDERED.**